OPINION
{¶ 1} Defendant-appellant, Garry L. Owens (hereinafter "appellant"), appeals from the judgment of the Franklin County Court of Common Pleas finding him not guilty of assault in violation of R.C. 2903.13, guilty of resisting arrest in violation of R.C. 2921.33, and guilty of disorderly conduct in violation of R.C. 2917.11. For the following reasons, we reverse the decision of the trial court.
 {¶ 2} On June 20, 2002, after 7:00 p.m., on duty Columbus police officer, Caroline Castro (hereinafter "Officer Castro"), was in her marked cruiser proceeding eastbound on Mt. Vernon Avenue when she came upon a yellow Volkswagen (hereinafter "car") stopped in the middle of the street. The car was running but there was no driver behind the wheel. A man, identified as Phillip Loney (hereinafter "Loney") was sitting in the front passenger seat. Officer Castro stopped behind the car, turned her beacon lights on, and got out of her cruiser. Activating the beacon lights resulted in the cruiser's videotape being activated, but not the audio.
 {¶ 3} In the following rendition of what transpired, unless stated otherwise, discussion of events and/or actions taken by any party are the result of viewing the videotape. However, statements regarding discussions which allegedly occurred between parties are gleaned from trial testimony.
 {¶ 4} As Officer Castro was approaching the car, appellant returned. She asked him if he was the owner of the car. Appellant indicated he was not the owner, but the driver, of the car. He explained to Officer Castro he stopped the car in the middle of the road because a young child had been in the roadway. Officer Castro testified since she did not view a child in the road, she concluded there was no immediate emergency. She instructed appellant to pull the car to the side of the road so she could issue him a parking citation. Appellant entered the car and pulled it to the curb. Officer Castro pulled her cruiser to the curb behind appellant's car.
 {¶ 5} Upon pulling the car over, appellant exited the car and walked around to the passenger side of the car. At that time, Loney exited the car and walked over to the driver side of the car. Appellant leaned into the passenger side of the car and began looking underneath the seat. At this time, Officer Castro re-approached the car. She testified since she did not know what appellant was doing, she asked appellant to show her his hands for safety reasons. Appellant stood up and showed Officer Castro his hands. Appellant and Officer Castro engaged in conversation, during which, appellant was gesturing toward the other side of the street.
 {¶ 6} Officer Castro requested appellant's identification. Appellant leaned into the passenger side of the car, retrieved his wallet, and handed his wallet to her. Upon retrieving the identification, Officer Castro placed appellant's wallet on the roof of the car.
 {¶ 7} Officer Castro radioed dispatch to inform them of her location, that she was issuing a parking citation, and was involved in a dispute. She returned to her cruiser, ran a LEADS check on appellant and checked the car's registration. The LEADS check revealed appellant's driver's license was suspended and he did not have driving privileges.
 {¶ 8} Officer Castro exited her cruiser and approached appellant and Loney. She asked Loney whether he had a valid driver's license, as he retrieved his identification. Officer Castro explained to appellant she could not let him drive because he did not have a valid license.
 {¶ 9} Subsequently, Officer Castro removed her handcuffs, approached appellant from behind, and grabbed his left arm and placed it in handcuffs. An altercation then took place between appellant and Officer Castro, during which Officer Castro maced appellant. Appellant was subsequently subdued and taken into custody by Columbus police. Appellant sustained injuries, including a broken arm, and was transported to the hospital.
 {¶ 10} On September 6, 2002, the Franklin County Grand Jury indicted appellant for assault, pursuant to R.C. 2903.13, resisting arrest, pursuant to R.C. 2921.33, and disorderly conduct, pursuant to R.C. 2917.11. On February 4, 2003, a jury found appellant not guilty of assault, but guilty of resisting arrest and disorderly conduct.
 {¶ 11} Appellant timely appeals and asserts the following assignments of error:
[1.] The trial court erred when it failed to instruct the jury on all matters of law necessary to render a proper verdict on the charge of resisting arrest when it failed to instruct the jurors that in order for an arrest to be lawful, the arresting officer must provide notice of both the intent to arrest and of the cause for the arrest.
[2.] The trial court erred when it entered a judgment of conviction against the [appellant] for resisting arrest when the evidence was insufficient to sustain the conviction and the conviction was against the manifest weight of the evidence presented when the prosecution failed to prove that the arrest was lawful and that proper notice had been given of the cause for the arrest, and also failed to prove that the [appellant] understood that he was under arrest. The court further erred by entering the conviction when the evidence established that excessive and unnecessary force had been used which the [appellant] was entitled to resist.
[3.] The trial court erred when it entered a judgment of conviction against the [appellant] for disorderely [sic] conduct when the evidence was insufficient to sustain the conviction and the conviction was against the manifest weight of the evidence presented.
[4.] The trial court erred when it entered the conviction of resisting arrest as a first-degree misdemeanor when the jury convicted the [appellant] only on the lesser offense of resisting as a second-degree misdemeanor. The trial court also erred when it entered the conviction of disorderly conduct as a fourth-degree misdemeanor when the jury was only charged on the lesser offense of disorderly conduct as a minor misdemeanor.
[5.] The trial court erred when it communicated with a deliberating jury off the record and our of the presence of the parties.
[6.] The trial court erred on ruling that excluded relevant evidence offered by the [appellant].
[7.] The state engaged in misconduct when it improperly accused defense witnesses, during cross-examination, of lying in prior statements to the prosecutor and the police without ever introducing evidence to support these damaging accusations. This violated the [appellant's] constitutional rights to confront and cross-examine witnesses and his rights to due process and a fair trial.
 {¶ 12} We begin our analysis with appellant's second assignment of error. Appellant argues insufficient evidence exists to establish his arrest was lawful.
 {¶ 13} In determining whether a record contains sufficient evidence to sustain the conviction, "[t]he relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, following Jackson v. Virginia (1979),443 U.S. 307, 99 S.Ct. 2781. In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. State v. Robinson (1955),162 Ohio St. 486. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. Tibbsv. Florida (1982), 457 U.S. 31, 45, 102 S.Ct. 2211, citingJackson, supra.
 {¶ 14} Appellant was convicted of resisting arrest, in violation of R.C. 2921.33(B), which provides, in relevant part, "[n]o person, recklessly or by force, shall resist or interfere with a lawful arrest of the person or another person and, during the course of or as a result of the resistance or interference, cause physical harm to a law enforcement officer." Thus, it must be established that appellant resisted a lawful arrest. We conclude, based on the facts before us, the evidence is legally insufficient to sustain a verdict for resisting arrest as appellant's arrest was not lawful as it was the fruit of an illegal investigatory stop.
 {¶ 15} In Terry v. Ohio (1968), 392 U.S. 1, 88 S.Ct. 1868, the United States Supreme Court first announced theFourth Amendment to the United States Constitution is not offended when a police officer, based upon his "reasonable suspicion" that criminal activity is or may be occurring, stops a suspect for questioning. The Ohio Constitution is not violated by this conduct, termed an "investigatory stop" regardless of the fact the police officer lacks probable cause to arrest the suspect.State v. Bobo (1988), 37 Ohio St.3d 177; State v. Chatton
(1984), 11 Ohio St.3d 59; State v. Freeman (1980),64 Ohio St.2d 291.
 {¶ 16} To warrant an investigatory stop, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." State v. Venham (1994),96 Ohio App.3d 649, 654. Determination of the propriety of the stop must be viewed under the totality of the circumstances. Bobo,
supra, paragraph one of the syllabus.
 {¶ 17} An investigatory stop "must be temporary and last no longer than is necessary to effectuate the purpose of the stop."Florida v. Royer (1983), 460 U.S. 491, 500, 103 S.Ct. 1319. "If during the initial detention * * * the officer ascertained reasonably articulable facts giving rise to a suspicion of criminal activity, the officer may then further detain and implement a more in-depth investigation of the individual."State v. Robinette (1997), 80 Ohio St.3d 234, 241.
Police have inherent authority to follow certain investigative procedures as a matter of course following a lawful traffic stop if the officer's suspicions of criminal activity have not been dispelled. Among these are a request to see a motorist's driver's license, registration, or vehicle identification number (VIN). * * * However, if the suspicions that triggered the initial stop are dispelled and there has been no violation of the law, then the officer has no authority to demand the driver's license, registration papers, or to check the VIN.
Venham, supra, at 656. (Citations omitted.)
 {¶ 18} As such, an investigatory stop which is prolonged and extends beyond the scope of the initial detention must be supported by a reasonable suspicion the suspect is engaged in another criminal activity. Id. A driver must be allowed to continue on his or her way, if, after discussion with the driver, a reasonable police officer would have been satisfied there was no unlawful activity. State v. Myers (1990),63 Ohio App.3d 765, 771.
 {¶ 19} We begin our analysis with the initial detention of appellant by Officer Castro. As testified to at trial, appellant stopped his car in the middle of the street because a young boy was in the middle of the street. It was while appellant was returning he child to the appropriate house that Officer Castro came upon appellant's car and stopped her cruiser behind it. The relevant portions of Officer Castro's testimony on direct examination with respect to her initial encounter of appellant and subsequent detention are set forth below:
A.: I was traveling eastbound on Mt. Vernon Avenue. I came upon a yellow vehicle that was parked in the middle of the road. The vehicle was running. No driver was in the car but a passenger was in the car.
I stopped my vehicle and turned on my beacons, exited my cruiser. As I was approaching the car in the street a man later identified as Mr. Owens approached me from the left side.
Q.: * * * This vehicle was where?
A.: It was parked in the middle of the street.
Q.: When you mean parked, the car was running but it was stopped, actually stopped?
A.: Yes.
Q.: How was traffic?
A.: It was obstructing the eastbound traffic. Traffic had to go left of center to get around it. Westbound traffic had to go to the far right to get around it. So it was obstructing both east and westbound traffic lanes.
* * *
A.: Okay. Mr. Owens approached me and I asked him if he was the owner of the car. And he said, no, but there was a kid in the road.
I said, are you driving the car, and he said, yeah, I'm about to move it. And I said, okay.
He started making aggressive gestures and saying, there was a kid in the road, there was a kid in the road.
I didn't see a kid in the road so there was no immediate emergency. So I said, okay, pull it to the side, I'm going to give you a parking citation, nothing really expensive. So he got into his vehicle. I got into my cruiser and followed him to the curb.
When he got to the curb his passenger got out of the car and he got out of the car, walked around to the passenger side, sat in the passenger seat and appeared to be rummaging underneath the passenger seat.
* * *
I got out of my car, approached him, and asked him to show me his hands for safety reasons. He showed me his hands.
I said, okay, what are you doing underneath the seat? That's when he kind of stopped and looked at me and he said, you know, what, do you want to search me? You know, do you want my fucking I.D.? Why are you doing this? Write your ticket and get the fuck out of here.
I said, yeah, I do want your I.D. So, he reached into the car underneath the driver's side visor and took out his wallet. He gave me his wallet.
I took out his I.D. * * * I marked with my radio dispatcher to let him know where I was, I was issuing a parking citation, had kind of a dispute. I went back to my cruiser.
(Tr. at 21-25.)
 {¶ 20} Accordingly, as stated by Officer Castro, the initial detention of appellant was to issue him a parking citation. A parking ticket in the City of Columbus is a civil matter. "In response to the state legislation, the City of Columbus enacted Chapter 2150 of the Columbus City Code, which became effective on March 1, 1983. The Code abolished criminal penalties for parking violations and set forth civil monetary penalties for parking infractions." Gardner v. City of Columbus, Ohio (1988),841 F.2d 1272, 1274.[1]
 {¶ 21} As such, the sole purpose of Officer Castro's initial detention of appellant was to issue a civil parking citation. It was not a traffic stop.[2] Thus, at the point in time when appellant was instructed to pull over to the side of the street, no criminal activity or violation occurred. This is confirmed by Officer Castro, "I felt like I was in a casual conversation trying to get to the bottom of what was going on. * * * Casual conversations are meaning I'm not investigating any criminal event. I'm simply trying to see what's going on." (Tr. at 53.) Moreover, at this time, nothing occurred which would have given Officer Castro a reasonable suspicion appellant was engaging in or attempting to conceal criminal activity. As such, Officer Castro's detention of appellant had to be temporary and last no longer than necessary to issue the parking ticket.
 {¶ 22} After appellant pulled the car over to the side of the street, Officer Castro's testimony fails to reveal any specific and articulable facts which gave rise to criminal activity so as to further detain and implement a more in-depth investigation. Officer Castro's testimony reveals a concern for her safety as appellant was rummaging under the passenger seat. Appellant showed Officer Castro his hands as she directed and this lessened her concern. "He shows me his hands. There's nothing in them. At that point my threat level is lowered a little." (Tr. at 36.) Additionally, she did not testify she was concerned appellant was engaging in or attempting to conceal criminal activity. Instead, consistent with her earlier testimony, Officer Castro testified, after obtaining appellant's driver's license, she returned to her cruiser and informed dispatch she was issuing a parking citation. As such, at the time she obtained appellant's driver's license the sole purpose of her detention was still to issue a parking citation. Thus, there was nothing further to investigate and her actions should have been limited to the issuance of the parking citation to appellant. State v. Medlar (1994),93 Ohio App.3d 483,491 (observation of illegally parked vehicle in fire lane did not justify an investigatory stop as parking violation was completed before driver entered vehicle and there was nothing for officer to investigate).
 {¶ 23} While the police are instilled with the authority to follow certain investigatory procedures, see Hibel v. SixthJudicial District Court of Nevada, Humboldt County (2004), ___ U.S. ___, 124 S.Ct. 2451, 2458 ("Our decisions make clear that questions concerning a suspect's identity are a routine and accepted part of many Terry stops.") (citations omitted), the initial stop must be based upon reasonable suspicion. Brown v.Texas (1979), 443 U.S. 47, 52, 99 S.Ct. 2637 (conviction for violating a Texas stop and identity statute invalidated onFourth Amendment grounds as initial stop was not based on specific, objective facts establishing reasonable suspicion to believe suspect was involved in criminal activity). By Officer Castro's own statement, she was not engaged in a traffic stop. To the contrary, as stated above, she was issuing a parking citation, which does not involve criminal activity. There is nothing in the record which supports a finding she held reasonable suspicions of criminal activity. Her testimony is devoid of either any mention of any suspicion of criminal activity or that she had a suspicion appellant was driving on a suspended license. Instead, the only stated concern Officer Castro expressed was for her safety, which was subsequently allayed. Thus, Officer Castro was without legal authority to demand appellant's driver's license in order to run the LEADS check.
 {¶ 24} This conclusion is not altered by the requirement of C.C.C. 2150.03(b) that, if the operator is present, the name of the operator shall be recorded on the ticket in the space provided on the ticket for identification of the offender. This requirement can be satisfied by a request for the identification for the limited purpose of recording the operator's name on the parking ticket. It does not, however, permit the police officer to continue retaining the operator's driver's license for the purpose of running a LEADS check.
 {¶ 25} As Officer Castro unlawfully detained appellant in violation of the Fourth Amendment, the results of the LEADS check are primary evidence directly obtained by Officer Castro during the illegal seizure. Thus, when Officer Castro attempted to arrest appellant, she acted based upon illegally obtained evidence. Therefore, she was not engaging in a lawful arrest of appellant. As such, reviewing the evidence in light most favorable to the prosecution, no rational trier of fact, knowing appellant's arrest resulted from illegally obtained evidence, could have found the essential elements of resisting arrest proven beyond a reasonable doubt.
 {¶ 26} Accordingly, appellant's second assignment of error is well-taken and is sustained with respect to sufficiency of the evidence.
 {¶ 27} We next examine appellant's contention in his third assignment of error that there was insufficient evidence to sustain his conviction for disorderly conduct.
 {¶ 28} A person who "recklessly cause[s] inconvenience, annoyance, or alarm to another by * * * [e]ngaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior" engages in disorderly conduct. R.C.2917.11(A)(1). Appellant's disorderly conduct conviction must be reviewed in two parts: (1) the events prior to Officer Castro's arrest of appellant; and (2) the events after Officer Castro's arrest of appellant. We will examine the events occurring after the arrest first.
 {¶ 29} As stated above, Officer Castro engaged in an unlawful arrest of appellant. R.C. 2921.33 does not forbid resisting an unlawful arrest. State v. Hendren (1996), 110 Ohio App.3d 496,498. "As shown by the plain language of the statute, the Ohio legislature decided to make lawful arrest an element of resisting arrest." Hoover v. Garfield Heights Mun. Court (C.A.6, 1986),802 F.2d 168, 174. As such, an individual, who is subjected to an unlawful arrest, may use reasonable force to resist. Hendren,
supra, at 499.
 {¶ 30} Our review of this record leads us to conclude, there is insufficient evidence to sustain appellant's conviction for disorderly conduct based upon his actions resulting from Officer Castro placing him under arrest. First, when Officer Castro attempted to place appellant under arrest, he was walking away from her, apparently unaware, with his back to her, talking to Loney and gesturing with his hands. He was not directing his actions toward Officer Castro. Moreover, once she placed his left arm in the handcuffs, appellant continued to gesture with his right arm. Again, his gestures were not directed at Officer Castro. This gesticulating was force appropriate in resisting an unlawful arrest. Moreover, as argued by appellant, when Officer Castro sprayed mace in appellant's face, she inflicted serious physical harm upon him. State v. Nims (Nov. 29, 1979), Cuyahoga App. No. 40422 (injuries 70-year-old woman sustained as a result of being maced in face by assailants constituted serious physical harm pursuant to R.C. 2901.01(E)(3)). Thus, his actions were force appropriate under the circumstances. Accordingly, reviewing the evidence in a light most favorable to the prosecution, no rational trier of fact could have found, knowing appellant's arrest was unlawful, the essential elements of disorderly conduct proven beyond a reasonable doubt with respect to his actions after his arrest.
 {¶ 31} Turning to appellant's actions prior to his arrest, we again conclude there is insufficient evidence to support his conviction for disorderly conduct. With respect to appellant's behavior prior to his arrest, Officer Castro testified appellant's fists were clenched (Tr. at 26), he made aggressive gestures and waved his arms, and was yelling and swearing (Tr. at 25). The videotape does not show appellant with clenched fists. Instead, it reveals appellant gesturing often with his hands, most of the time, at the other side of the road. In the instances where appellant and Officer Castro are interacting, appellant's gestures are not directed at her. Moreover, irrespective of where appellant's gestures were directed, they were not of a threatening nature. His gestures, taken together with his body language and facial expression, indicate a person frustrated with a situation. There is nothing in the videotape which supports the conclusion appellant was engaged in violent or turbulent behavior prior to his arrest.
 {¶ 32} As to the use of profanity by appellant, "[a] person may not be punished for speaking boisterous, rude or insulting words, even with the intent to annoy another, unless the words by their very utterance inflict injury or are likely to provoke the average person to an immediate retaliatory breach of the peace."State v. Lamm (1992), 80 Ohio App.3d 510, 513. In this matter, Officer Castro testified appellant said "fuck" a number of different times and directed the statements at her. To echo theLamm court's sentiments, while we neither condone nor approve of the use of profanity or disrespect toward police officers, the evidence presented failed to establish that the language uttered by appellant was likely to inflict injury or provoke the average person to an immediate retaliatory breach of the peace.
 {¶ 33} As such, reviewing this record in a light most favorable to the prosecution, no rational trier of fact could have found the essential elements of disorderly conduct proven beyond a reasonable doubt with respect to appellant's behavior prior to his arrest.
 {¶ 34} Accordingly, appellant's third assignment of error is well-taken and is hereby sustained.
 {¶ 35} Based on the foregoing, appellant's second and third assignments of error are well-taken and are hereby sustained, appellant's first, fourth, fifth, sixth, and seventh assignments of error are hereby deemed moot, and the judgment of the Franklin County Court of Common Pleas is reversed. This case is remanded for further proceedings in accordance with law and this opinion.
Cause reversed and remanded.
Bowman, J., and Lazarus, P.J., concur.
[1] The manner in which a parking ticket shall be served when the operator of the vehicle is present is set forth in C.C.C. 2150.03(b):
A law enforcement officer who issues a parking ticket for a parking infraction shall complete the ticket by identifying the parking infraction charged, recording the license plate number, type and make or model of the vehicle and indicating the date, time and place of the parking infraction charged. * * * If the operator of the vehicle is present, the officer also shall record on the ticket the name of the operator in the space provided on the ticket for identification of the offender, and then shall personally serve the parking ticket upon the operator.
[2] The conclusion this was not a traffic stop is drawn from various places in Officer Castro's testimony. First, on direct examination, she explained why she did not turn on her audio:
By division directives, there are certain times when we are required to videotape things. Videotape would be for suspected DUI, traffic stops and arrests, motor vehicle violations, moving violations and vehicular pursuits. Those are when we are required to. That would also be when you would want to have your audio on as well.
* * *
I didn't have [the audio] on because I wasn't initiating a moving violation traffic stop. I was basically — my beacons were on because there was an obstruction on the road, and my beacons were on so my cruiser didn't get hit, so his car didn't get hit from behind. That's how I deal with any obstruction. * * *
(Tr. at 33-34.)
Additionally, during cross-examination, she was questioned regarding the initial stop and affirmed it was not a moving violation:
A.: * * * It was an obstruction of traffic, but it was a parking violation. There was nobody operating behind the wheel. That's why I was going to issue a parking citation.
Q.: So there was a parking violation, no moving violation?
A.: Yes, sir.
Q.: Did you ever determine this to be a moving violation?
A.: I did not, sir, no.
* * *
A.: What happened was not a moving violation based on his statement to me that he was the operator of the vehicle.
(Tr. at 49-50.)