[Cite as *State v. Westover*, 2014-Ohio-1959.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 13AP-555 |
| | | (C.P.C. No. 12CR-4673) |
| Drew M. Westover, | : | |
| | | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on May 8, 2014

*Ron O'Brien,* Prosecuting Attorney, and *Barbara A. Farnbacher,* for appellee.

*Yeura R. Venters,* Public Defender, and *John W. Keeling,* for appellant.

APPEAL from the Franklin County Court of Common Pleas

CONNOR, J.

{¶ 1} Defendant-appellant, Drew M. Westover, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty, pursuant to a plea of no contest, of one count of possession of heroin, in violation of R.C. 2925.11. Defendant assigns the following sole assignment of error for our review:

> WHEN THREE POLICE OFFICERS STOPPED, APPROACHED, AND QUESTIONED THE DEFENDANT, WHO WAS LEGALLY STANDING AND TALKING WITH FRIENDS, AND INTERROGATED THE ENTIRE GROUP ABOUT THEIR ACTIVITIES AND TOOK THEIR DRIVER'S LICENSES TO RUN A WARRANT CHECK, THE DEFENDANT DID NOT FEEL FREE TO LEAVE AND HE WAS UNCONSTITUTIONALLY DETAINED IN THE ABSENCE OF ANY REASONABLE, ARTICULABLE SUSPICION THAT HE WAS ENGAGED IN ANY CRIMINAL

ACTIVITY AND THE TRIAL COURT ERRED IN OVERRULING THE DEFENDANT'S MOTION TO SUPPRESS UNDER THIS COURT'S DECISION IN STATE V. JONES, 188 OHIO APP.3d 628, 2010-OHIO-2854, 936 N.E.2d 529 (10th DIST.)

Because the trial court erred in denying defendant's motion to suppress the evidence against him, we reverse the judgment and remand the case to the trial court.

## I.      FACTS & PROCEDURAL HISTORY

{¶ 2}   The State indicted defendant on September 13, 2012, on one count of possession of heroin, a felony of the fifth degree. The events giving rise to the indictment occurred on February 25, 2012, in Grandview Heights, Ohio.

{¶ 3}   On February 25, 2012, at 8:00 p.m., Sergeant Lesley Jackson of the Grandview Heights police department was on routine patrol in the area of Broadview Avenue and W. 3rd Avenue. She was driving her marked police cruiser and wore her police uniform. As Sergeant Jackson drove southbound on Broadview Avenue, she noticed three to four people standing outside of a car which was legally parked on the east side of the street.

{¶ 4}   Sergeant Jackson stated that the group "seemed nervous" as she drove by, and she then noticed that the trunk was open. In her rearview mirror, Sergeant Jackson saw someone take something from the trunk of the car up to the house located at 1273 Broadview Avenue. Sergeant Jackson was familiar with that particular house, as she had been called there "on more than one occasions" due to drug activity. (Tr. 7.) Specifically, she stated that "[o]ne of the residents to the house overdosed a couple of times, and one person has been known to stay there regularly who had a pending drug-trafficking charge against him." (Tr. 7.)

{¶ 5}   After driving by the group, Sergeant Jackson turned her cruiser around at the end of the street and drove back to the group to "see what was going on." (Tr. 6.) Sergeant Jackson parked her cruiser directly behind the car the group was standing around. She then radioed for assistance, stating over the radio that "she had a suspicious group of people." (Tr. 19.)

{¶ 6}   The group of individuals, which included defendant, was standing on the sidewalk near their vehicle. Sergeant Jackson exited her vehicle, approached the group,

and asked what they were doing. They explained that "they were waiting for somebody to come out of 1273 Broadview." (Tr. 6.) Sergeant Jackson then asked the group what was in the box that the individuals had taken up to the house. They told her "it was a tool box." (Tr. 8.) Sergeant Jackson then asked everyone for identification,[1] in order to "find out, you know, who's there." (Tr. 8.) Sergeant Jackson stated that she routinely asks individuals for identification, noting that "[e]veryone we stop and talk to we ask for identification to verify that's who they are." (Tr. 10.) Everyone in the group handed their identifications over to Sergeant Jackson. As Sergeant Jackson was collecting the identifications, two other uniformed officers, Officers Greg Gillespie and Russell Blank, arrived in their marked police vehicle. Officers Gillespie and Blank parked directly behind Sergeant Jackson's vehicle.

{¶ 7} Sergeant Jackson took everyone's identification back to her police cruiser and ran a check for outstanding warrants on all the individuals present in the group. As Sergeant Jackson was running the warrants check, the two other officers exited their vehicle and were standing on the sidewalk "with [the] group of people to observe if anybody did anything, you know, for [Sergeant Jackson's] safety." (Tr. 20.) Officers Blank and Gillespie were standing on the sidewalk "right next to" defendant, approximately "four or five feet" away from him. (Tr. 26, 35.) Officer Gillespie noted that he was having a conversation with the defendant as they stood on the sidewalk, noting that he knew defendant from "when he was in high school." (Tr. 28.) There is no indication that Sergeant Jackson informed the group that she wanted their identifications in order to run a warrants check; rather, the record demonstrates that Sergeant Jackson simply requested everyone's identification, and then took the identifications to her cruiser to run the warrants check.

{¶ 8} Sergeant Jackson's warrant check revealed that defendant had an outstanding warrant for his arrest. Officers Blank and Gillespie arrested defendant based on the warrant. In the search incident to arrest, the officers discovered heroin on defendant's person.

---

[1] The record indicates only that Sergeant Jackson asked for and received "identification" from defendant and the others in the group. It is unclear whether defendant produced his driver's license or some other form of identification.

{¶ 9} Defendant filed a motion to suppress on February 4, 2013, asserting that the evidence against him was obtained while he was unreasonably detained in violation of the Fourth Amendment to the United States Constitution. After hearing the above noted evidence, the trial court orally denied the motion to suppress. The trial court noted that the State argued that "there was reasonable suspicion to run a records check or warrant check," but the trial court did "not agree there was reasonable suspicion." (Tr. 48-49.) Nevertheless, the trial court held that, because defendant voluntarily provided his identification to the officers, the officers then had "a right to run a record check, and if a record check comes back with a warrant at that point, they have a right to make an arrest." (Tr. 49.) The trial court found that no warrantless seizure occurred in this case.

{¶ 10} Thereafter, defendant entered a no contest plea to the charged crime. The trial court accepted the plea and found defendant guilty of possession of heroin.

## II.    UNCONSTITUTIONAL SEIZURE

{¶ 11} "[A]ppellate review of a trial court's decision regarding a motion to suppress evidence involves mixed questions of law and fact." *State v. Vest,* 4th Dist. No. 00CA2576, (May 29, 2001). Thus, an appellate court's standard of review of the motion to suppress is two-fold. *State v. Reedy,* 10th Dist. No. 05AP-501, 2006-Ohio-1212, ¶ 5, citing *State v. Lloyd,* 126 Ohio App.3d 95, 100-01 (7th Dist.1998). When considering a motion to suppress, the trial court assumes the role of trier of fact, and therefore is in the best position to resolve factual questions and evaluate the credibility of witnesses. *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. As a result, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Id.* Then, the appellate court must independently determine whether the facts satisfy the applicable legal standard, pursuant to a de novo review and without giving deference to the conclusion of the trial court. *Id.*

{¶ 12} The Fourth Amendment to the United States Constitution as applied to the states through the Fourteenth Amendment, as well as Ohio Constitution, Article I, Section 14, prohibit the government from conducting warrantless searches and seizures, rendering them per se unreasonable unless an exception applies. *State v. Mendoza,* 10th Dist. No. 08AP-645, 2009-Ohio-1182, ¶ 11, citing *Katz v. United States,* 389 U.S. 347,

357 (1967). However, "not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred" within the meaning of the Fourth Amendment. *Terry v. Ohio,* 392 U.S. 1, 19 (1968), fn. 16; *Brendlin v. California,* 551 U.S. 249, 254 (2007).

{¶ 13} In determining whether a particular encounter constitutes a "seizure," and thus implicates the Fourth Amendment, the question is whether, in view of all the circumstances surrounding the encounter, a reasonable person would believe he or she was "not free to leave," *United States v. Mendenhall,* 446 U.S. 544, 554 (1980), or "not free to decline the officers' requests or otherwise to terminate the encounter." *Florida v. Bostick,* 501 U.S. 429, 439 (1991). *See also Michigan v. Chesternut,* 486 U.S. 567, 573 (1988); *Florida v. Royer,* 460 U.S. 491, 502 (1983) (plurality opinion). "[T]he crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' " *Bostick* at 437, quoting *Chesternut* at 569. *See also Bostick* at 438, citing *Royer* at 519, fn. 4 (Blackmun, J., dissenting) (Emphasis sic.) (noting that the " 'reasonable person' test presupposes an *innocent* person") (Emphasis added.). A person "may not be detained even momentarily without reasonable, objective grounds for doing so." *Royer* at 498.

{¶ 14} The United States Supreme Court recognizes three categories of police-citizen interactions: (1) a consensual encounter, which requires no objective justification, *see Bostick* at 434; (2) a brief investigatory stop or detention, which must be supported by reasonable suspicion of criminal activity, *see Terry;* and (3) a full-scale arrest, which must be supported by probable cause. *See Brown v. Illinois,* 422 U.S. 590 (1975).

{¶ 15} A consensual encounter occurs when the police approach a person in a public place, the police engage the person in conversation, and the person remains free not to answer or to walk away. *Royer* at 497; *Mendenhall* at 553-54. A consensual encounter remains consensual even if police officers ask questions, ask to see the person's identification, or ask to search the person's belongings, provided "the police do not convey a message that compliance with their requests is required." *Bostick* at 435;

*Florida v. Rodriguez,* 469 U.S. 1, 4-6 (1984); *Immigration & Naturalization Serv. v. Delgado,* 466 U.S. 210, 216 (1984). A police officer may lawfully initiate a consensual encounter without probable cause or a reasonable, articulable suspicion that an individual is currently engaged in criminal activity or is about to engage in such conduct. *Mendenhall* at 556. The Fourth Amendment guarantees are not implicated in a consensual encounter unless the officer has, by either physical force or show of authority, restrained the person's liberty so that a reasonable person would not feel free to decline the officer's requests or otherwise terminate the encounter. *Mendenhall* at 554. Once a person's liberty has been so restrained, the encounter loses its consensual nature and falls into one of the other two Supreme Court categories. *State v. Taylor,* 106 Ohio App.3d 741, 748 (2d Dist.1995); *State v. Guinn,* 10th Dist. No. 99AP-630 (June 1, 2000) (memorandum decision).

{¶ 16} The next category of police-citizen interaction is an investigatory detention, commonly referred to as a *Terry* stop. *See Terry.* An investigatory stop constitutes a seizure for purposes of the Fourth Amendment. *Guinn,* citing *Terry* at 16. Under *Terry,* a police officer may stop or detain an individual without probable cause when the officer has reasonable suspicion, based on specific, articulable facts, that criminal activity is afoot. *Terry* at 21-22. Accordingly, "[a]n investigative stop does not violate the Fourth Amendment to the United States Constitution if the police have reasonable suspicion that 'the person stopped is, or is about to be, engaged in criminal activity.' " *State v. Jordan,* 104 Ohio St.3d 21, 2004-Ohio-6085, ¶ 35, quoting *United States v. Cortez,* 449 U.S. 411, 417 (1981). "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Royer* at 500; *United States v. Brignoni–Ponce,* 422 U.S. 873 (1975); *State v. Chatton,* 11 Ohio St.3d 59, 63 (1984).

{¶ 17} Reasonable suspicion entails some minimal level of objective justification, "that is, something more than an inchoate and unparticularized suspicion or 'hunch,' but less than the level of suspicion required for probable cause." *State v. Jones,* 70 Ohio App.3d 554, 556-57 (2d Dist.1990), citing *Terry* at 27; *State v. Carter,* 69 Ohio St.3d 57, 66 (1994). "A police officer may not rely on good faith and inarticulate hunches to meet the *Terry* standard of reasonable suspicion." *Jones* at 557. An appellate court views the

propriety of a police officer's investigative stop or detention in light of the totality of the surrounding circumstances. *State v. Bobo,* 37 Ohio St.3d 177 (1988), paragraph one of the syllabus, approving and following *State v. Freeman,* 64 Ohio St.2d 291 (1980), paragraph one of the syllabus. Factors suggesting that a person has been seized include: a threatening presence of several officers; the display of a weapon by an officer; some physical touching of the person; the use of language or tone of voice indicating that compliance with the officer's request might be compelled; approaching the person in a nonpublic place; and blocking the person's path. *Mendenhall* at 554.

{¶ 18} The third and final category of police-citizen interaction is a seizure that is the equivalent of an arrest. "A seizure is equivalent to an arrest when: (1) there is an intent to arrest; (2) under real or pretended authority; (3) accompanied by an actual or constructive seizure or detention; and (4) which is so understood by the person arrested." *Taylor* at 749, citing *State v. Barker,* 53 Ohio St.2d 135 (1978), syllabus. "A warrantless arrest that is based upon probable cause and occurs in a public place does not violate the Fourth Amendment." *State v. Brown,* 115 Ohio St.3d 55, 2007-Ohio-4837 at ¶ 66, citing *United States v. Watson,* 423 U.S. 411 (1976).

{¶ 19} Sergeant Jackson's initial interaction with defendant was unquestionably consensual. The entire encounter occurred outside, on a public sidewalk. Sergeant Jackson did not activate her overhead lights when she approached the group. She then exited her vehicle, asked the group some general questions, and asked to see everyone's identification. Sergeant Jackson noted that, in her experience, it is "rare that people will refuse to provide identification," and indeed, everyone in the group provided Sergeant Jackson with their identifications. (Tr. 15.) Simply asking for and receiving the group's identifications did not alter the consensual nature of the encounter. *Royer*; *Mendenhall*; *Bostick*.

{¶ 20} However, what begins as a consensual encounter may escalate into an investigatory detention and seizure of a person that triggers Fourth Amendment scrutiny if, in view of all the circumstances surrounding the incident, a reasonable person would not feel free to leave or otherwise terminate the encounter. *Delgado* at 215, citing *Mendenhall* at 554; *Guinn*. If the seizure is unlawful, any evidence obtained after the unlawful seizure must be suppressed as the "fruit of the poisonous tree." *Wong*

*Sun v. United States*, 371 U.S. 471 (1963); *Mapp v. Ohio*, 367 U.S. 643 (1961); *State v. Pierce*, 125 Ohio App.3d 592, 597 (10th Dist.1998).

{¶ 21} We hold that, when Sergeant Jackson retained defendant's identification and took it to her cruiser to run a warrants check, defendant was unconstitutionally seized under the Fourth Amendment. In so holding, we rely on this court's decision in *State v. Jones*, 188 Ohio App.3d 628, 2010-Ohio-2854, ¶ 24 (10th Dist.)

{¶ 22} In *Jones,* the defendant was sitting in the driver's seat of his parked vehicle with the car running but the headlights off, at 1:00 a.m., in the Hilltop area of Columbus, a purportedly high-crime area. Two uniformed officers on routine bicycle patrol approached defendant's vehicle and asked him several questions. The defendant was "[v]isibly nervous, shaking, and breathing heavily," and told officers that "everything was fine; he explained that he was waiting to go to work and had pulled over to text his girlfriend." *Id.* at ¶ 4. Although there was no indication that Jones was about to commit a crime, the officers, "asked for defendant's driver's license to verify his identity and to run a records check for warrants." *Id.* at ¶ 5. Defendant handed his license to the officers and remained in his vehicle. Thereafter, the officers discovered a large knife in defendant's vehicle, and the defendant was ultimately convicted of carrying a concealed weapon.

{¶ 23} This court held that defendant was seized for Fourth Amendment purposes when the officers retained his driver's license to run a warrants check. We observed that, "no reasonable person would believe that he or she is free to terminate the encounter and simply drive away when an officer retains his or her driver's license for the purpose of running a computer check for outstanding warrants." *Id.* at ¶ 25. By retaining the license to check for outstanding warrants, the officers had "implicitly commanded defendant to remain on the scene since," abandoning one's "driver's license and driv[ing] away is not a realistic option for a reasonable person in today's society." *Id.* at ¶ 26.

{¶ 24} The State contends that *Jones* is "critically distinguishable" because here "defendant was not the sole occupant or even the driver of the parked car." (Appellee's brief, 13.) We note that the only indication in the record regarding defendant's status as either a driver or a passenger of the vehicle is Sergeant Jackson's statement that

defendant "wasn't driving as far as [she knew]." (Tr. 10.) For purposes of this decision, however, we will assume that defendant was merely a passenger in the car.

{¶ 25} The State contends that "[w]hen an officer retains a driver's license to run a warrant check, a driver cannot legally drive away, * * * but the same cannot be said for a pedestrian," who may legally walk on a sidewalk without a driver's license. (Appellee's brief, 13.) The issue before this court, however, is not whether defendant could have physically walked away while Sergeant Jackson retained his identification and was running the warrants check; rather, the issue is whether a reasonable person in that situation would have believed they were free to leave or free to decline the officers' requests and terminate the encounter. *See United States v. Lambert*, 46 F.3d 1064, 1068 (10th Cir.1995) (noting that "[t]he question of whether an individual has been detained turns on whether a person under the circumstances would reasonably feel at liberty to refuse the agents' questions or otherwise terminate the encounter," and not "whether it is conceivable that a person could leave the location of that encounter").

{¶ 26} We conclude that no reasonable person would have felt free to terminate the encounter and go about their business, where an officer is holding that individual's identification and is using it to run a warrants check. *See Jones*; *Commonwealth v. Lyles*, 453 Mass. 811, 816 (2009) (finding that Lyles was unconstitutionally seized when two officers approached him as he was walking on a public sidewalk, asked for his identification, and then used Lyles identification to do a radio check for warrants; by retaining the identification to check for outstanding warrants, the officers implicitly commanded Lyles to remain on the scene as "a reasonable person would not believe that he could terminate the encounter and leave, given the importance of having identification, such as a driver's license, to daily transactions in today's society"); *State v. Daniel*, 12 S.W.3d 420, 423, 427 (2000) (where an officer approached "[f]our men [who] were standing around the outside of the vehicle," and asked for and received their identifications, and then "retained the identification to run a computer check for outstanding warrants," the court found that the officer's retention of the identification to run a warrants check reflected "a distinct departure from the typical consensual encounter" and amounted to an unconstitutional seizure); *State v. Thomas*, 91 Wash.App. 195, 955 P.2d 420, 423 (1998) (stating that "[o]nce an officer retains the

suspect's identification or driver's license and takes it with him to conduct a warrants check, a seizure within the meaning of the Fourth Amendment has occurred"). *See also Lambert* at 1068 (noting that "when law enforcement officials retain an individual's driver's license in the course of questioning him, that individual, as a general rule, will not reasonably feel free to terminate the encounter"); *Royer* (holding that when the officers took Royer to a small room in the airport, while retaining his airline ticket and identification, this show of authority was sufficient to transform the initial consensual encounter into a Fourth Amendment seizure); *Mendenhall* (finding that no seizure occurred when officers took Mendenhall to the airport office, where the officers had returned Mendenhall's ticket and identification before they asked her to accompany them to the office); *Lyles* at 816, fn.7, quoting Neda Matar, *Are You Ready For a National ID Card? Perhaps We Don't Have to Choose Between Fear of Terrorism and Need for Privacy*, 17 Emory Int'l L.Rev. 287, 321 (2003) (noting that a driver's license is " 'the most commonly requested form of verification in industries ranging from banks, to nightclubs and liquor stores, to trains, planes, and rental cars,' " and that it would be " 'difficult to cash checks, enter secured areas, or even purchase alcohol without a driver's license,' " or other legitimate form of identification).

{¶ 27} Our holding today does not conflict with this court's holding in *State v. McDowell*, 10th Dist. No. 13AP-229, 2013-Ohio-5300. There, McDowell was walking in an alley in the Hilltop area of Columbus when a police officer approached him, asked him some questions, and asked for his identification. McDowell handed his identification to the officer; the officer stepped back to his cruiser, wrote down McDowell's general information, and handed the identification back to McDowell. We concluded that the officer's brief retention of McDowell's identification in order to jot down McDowell's information did not constitute an unreasonable seizure under the Fourth Amendment. In *McDowell,* we distinguished *Jones* by noting not only that McDowell was "on foot and not in the driver's seat of a car," but also that the officer in *McDowell* "did not take the time to run a warrant check on appellant while he was in possession of appellant's ID." *Id.* at ¶ 29.

{¶ 28} We find the running of a warrants check to be the critical distinction between *Jones* and *McDowell.* As noted above, the Fourth Amendment is not implicated

when an officer approaches an individual, asks them general questions, and asks to see their identification. An officer in receipt of an individual's identification may accordingly jot down the information presented on the identification without implicating the Fourth Amendment. However, when an officer takes the further action of retaining an individual's identification to run a warrants check, the officer has implicitly commanded the individual to remain on the scene, as no reasonable person would abandon their identification, and has demonstrated that they suspect that criminal activity is afoot. An officer must have some reasonable, articulable suspicion that criminal activity is afoot before they may detain someone in this manner to run a warrants check. *Compare State v. Owens*, 10th Dist. No. 03AP-423, 2004-Ohio-5159, ¶ 23 (noting that, because the officer lacked reasonable, articulable suspicion of criminal activity, the officer "was without legal authority to demand appellant's driver's license in order to run the LEADS check").

{¶ 29} Furthermore, in *McDowell,* there was only one officer, and we noted that the officer did not engage in any overt show of force or authority. In contrast, here, although the encounter began with only Sergeant Jackson and her police cruiser, one minute or two after her arrival, another marked cruiser with two other uniformed officers arrived on the scene. The two other officers got out of their cruiser and stood four or five feet away from defendant on the sidewalk while Sergeant Jackson ran the warrants check. In such a situation, no reasonable person would believe that they were at liberty to terminate the encounter. *See Daniels* at 427; *State v. Goodloe*, 10th Dist. No. 13AP-141, 2013-Ohio-4934, ¶ 13 (where one officer stood to the side of Goodloe, and the other stood in front of him, on a public sidewalk, this court concluded that "[t]he presence of two uniformed officers positioned as found by the trial court would communicate to a reasonable person that he was not at liberty to ignore the police and walk away").

{¶ 30} The State asserts that no seizure occurred in this case, because defendant was waiting for his friend to return from the Broadview Avenue residence when Sergeant Jackson ran the warrants check. The State thus argues that Sergeant Jackson's warrants check did not detain defendant, as defendant was detained by his own decision to wait for his friend. In *Bostick,* the court held that, where an individual's freedom of

movement is restricted by their own choices, as opposed to police conduct, the "free to leave" analysis is inapplicable, and the "appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id.* at 430. We have already determined above that no reasonable person would have felt free to terminate the encounter herein, where one officer had possession of defendant's identification and was using it to run a warrants check, and two other uniformed officers were standing within five feet of defendant. *Compare State v. Bennett*, 4th Dist. No. 99 CA 2509 (June 21, 2000) (although the defendant could not have driven away from the officers, due to his intoxication and lack of a driver's license, the court found no unlawful detention as the record revealed that (1) the officers did not seize any items of appellant's personal property; (2) the officers returned appellant's identification to him; and (3) the officers advised appellant that he could decline to consent to the search).

{¶ 31} The State asserts that, even if defendant was seized when Sergeant Jackson retained his identification to run the warrants check, Sergeant Jackson had reasonable, articulable suspicion to "investigate the visibly nervous group of people waiting outside the known drug house on a cold winter night." (Appellee's brief, 15.) We disagree. Sergeant Jackson stated that she asked for everyone's identification herein, noting that it was "routine," whenever "there is a possibility that there is some sort of indication * * *, because of the regular complaints that we get about [that] house * * * to check to see if that might be why they were there." (Tr. 10.) This testimony indicates that Sergeant Jackson believed she had a reasonable, articulable suspicion of criminal activity because defendant and his friends were waiting outside of a house where one resident had previously overdosed and one resident had a pending drug trafficking charge. A person's mere presence in a high crime area does not suspend the protections of the Fourth Amendment, nor is it a sufficient basis to justify an investigative stop. *Brown v. Texas,* 443 U.S. 47, 51-52 (1979); *Carter* at 65; *State v. Chandler,* 54 Ohio App.3d 92, 97 (8th Dist.1989). "[A]n investigatory stop is not justified solely because the detention occurred in an area where there is a significant amount of drug activity," rather, the "situs of a stop is simply one factor which may be considered in determining whether reasonable suspicion existed." *Guinn.* The mere fact that defendant and his

friends were waiting outside a house where residents were known to use drugs was insufficient to support a reasonable, articulable suspicion that defendant was, or was about to be, engaged in criminal activity.

{¶ 32} Additionally, although Sergeant Jackson stated that the group "seemed nervous" when she drove by, she did not reiterate that sentiment after she actually made contact with the group, and neither Officers Gillespie nor Blank testified that the group appeared nervous to them. (Tr. 6.) "Although some degree of nervousness during interactions with police officers is not uncommon, * * * nervousness can be a factor to weigh in determining reasonable suspicion." *State v. Atchley*, 10th Dist. No. 07AP-412, 2007-Ohio-7009, ¶ 14, citing *State v. Grant*, 9th Dist. No. 06CA0019-M, 2007-Ohio-680, ¶ 11. On the facts of this case, we do not find that Sergeant Jackson's initial observation that the group "seemed nervous" when she drove by would support reasonable, articulable suspicion of criminal activity. (Tr. 6.)

{¶ 33} Reviewing the totality of the circumstances surrounding the encounter between defendant and the officers that evening, we do not agree with the State's contention that Sergeant Jackson had a reasonable, articulable suspicion that criminal activity was afoot. Rather, Sergeant Jackson was acting on a mere hunch that defendant and his friends were engaged in criminal activity when she decided to retain their identifications and run a check for outstanding warrants.

{¶ 34} What initially began as a consensual encounter in this case escalated into an investigative detention when Sergeant Jackson, unsatisfied with defendant's and his friends' explanation as to why they were waiting outside the Broadview Avenue residence, sought to confirm her intuition that something might be wrong by retaining everyone's identification in order to run a warrants check. At that moment, any consensual aspect of the encounter ended, and defendant was seized within the meaning of the Fourth Amendment. The officers' knowledge of the outstanding warrant was the fruit of defendant's unlawful seizure, and accordingly, the evidence recovered from defendant following his arrest must be suppressed.

{¶ 35} Based on the foregoing, defendant's sole assignment of error is sustained.

III.   DISPOSITION

{¶ 36} Having sustained defendant's sole assignment of error, we reverse the judgment of the Franklin County Court of Common Pleas, and remand the case to the trial court for proceedings consistent with this decision.

*Judgment reversed; case remanded.*


KLATT, J., concurs.
O'GRADY, J., concurs in judgment only.

_____