WELBAUM, J.
{¶ 1} In this case, Defendant-Appellant, Brian J. Ward, appeals from his conviction and sentence on one count of Possession of Heroin and one count of Tampering with Evidence. Ward contends that the trial court erred in overruling his motion to suppress evidence, because he was unconstitutionally detained by the police and *128 because his consent to search was involuntary.
{¶ 2} We conclude that the trial court did not err in overruling Ward's motion to suppress evidence. Both Ward's initial and second encounters with a police officer were consensual, and Ward voluntarily consented to a search. Furthermore, once the search began, the officer found weapons and had a reasonable, articulable suspicion of danger that would justify seizing Ward and continuing the search.
{¶ 3} Accordingly, the judgment of the trial court will be affirmed.
I. Facts and Course of Proceedings
{¶ 4} The following facts were disclosed at a suppression hearing held in the trial court. The only witness at the hearing was Miamisburg Police Officer, Kevin Current. On July 25, 2015, Current was patrolling an area called the 2-Beat, which was located north of Interstate 75. Current was wearing the uniform of the day and was in a marked cruiser.
{¶ 5} At about 12:35 a.m., while traveling in the area of North 11th Street and Pearl Avenue, Current encountered a man (later identified as Brian Ward), walking north on North 11th Street. This was nothing out of the ordinary and did not concern Current. However, Current had been working in that area for quite a while, knew most of the residents, and did not recognize Ward.
{¶ 6} When Current first saw Ward, Ward was walking toward him. Current stopped his cruiser and asked Ward who he was and where he was headed. Ward said he was in town from Kentucky and was working in the area for a realtor. Ward also said he was going to a friend's house where he was visiting or staying. The friend was an individual named Ernest W. Current was familiar with Ernest, as the police had dealt with Ernest numerous times for various criminal reasons, including drugs. Current stated that the police had prior drug issues at Ernest's house and also at the house next door.
{¶ 7} Current initially spoke with Ward through the window of his cruiser. He stated that Ward did not smell of alcohol, did not look intoxicated, and did not look as if he were under the influence of drugs.
{¶ 8} After obtaining Ward's social security number, Current pulled up the street and parked his cruiser. He ran Ward's information and found Ward did not have any outstanding warrants. Current then began entering comments to the call screen on his computer. While he did this, Ward continued to walk north on North 11th Street, on the opposite side of the street from the cruiser. When Ward reached the area where Current was parked, Current exited the cruiser and again engaged in conversation with Ward. Because of the location where Ward was headed and the people Ward associated with, Current asked Ward if he had anything illegal. Ward said no. After Ward said no, Current continued to walk towards him. Current then asked Ward if he could "check," and Ward said yes. Transcript of Proceedings, p. 28.
{¶ 9} As the search began, Current noticed box-cutters that were attached to Ward's front pants pockets. The cutters were inside Ward's pockets, and were attached with a clip on the outside of the pocket. Current's testimony is unclear as to whether he could actually see the box-cutters or could only see the clips on the outside of Ward's pockets. See Transcript of Proceedings, p. 29. In this regard, the following exchange occurred:
Q. Now, you said he had these box-cutters affixed to him, to his pants?
A. Yes.
Q. Were they covered?
*129 A. They were in his front pockets with a clip. They have clips, so they were clipped. Like the box-cutter was inside and the clips were on the outside of the pockets.
Q. Okay. And you could see them before you put your hands on them?
A. Yes.
Id.
{¶ 10} When Current began to patdown Ward, he got behind him, as he normally does. Once he got to the pocket, he asked Ward if he could remove the box-cutters. Ward said no. Transcript of Proceedings, p. 30. However, when Current explained that he wished to remove the box-cutters for his safety and would return them, Ward agreed. At that point, Current had hold of Ward's arm. He folded Ward's arm away from the box-cutters and removed them.
{¶ 11} Current then continued the patdown and felt gel capsules in the right front pocket of Ward's pants. Current felt them through the outside of Ward's pants, with his fingers. Based on his experience in detecting gel caps, Current immediately knew these were gel caps, and concluded that they probably contained heroin.
{¶ 12} Current asked Ward if he could reach in his pocket and remove the gel caps, but Ward said no. Current then told Ward that he knew Ward had heroin in his pocket. At that point, Ward pulled away from Current and began to run. Ward ran north towards Ernest's house. Current then called for help on his portable radio and ran after Ward. He was able to grab Ward's sleeve for a moment, but Ward got away.
{¶ 13} In the area where Ward was stopped, the road runs across a creek, and a little tree-line leads down into the creek bed. The road forms a bridge across the creek, and Current ran onto the bridge so that he could maintain visual contact with Ward. Ward ran straight through the tree-line and down to the creek. Ward was about 10 to 12 feet away, at the bottom of the creek, and Current spotlighted Ward with his flashlight. Current could see Ward clearly, and Ward was pulling items from his right pocket and dropping them in the creek. At that time, Current was ordering Ward to stop, to keep his hands out of his pocket, and to come out of the creek. However, Ward continued to pull items from his pocket.
{¶ 14} Once Ward finished dropping items from his pocket, he began to come out of the creek area. By that time, Officer Priest had arrived on the scene. Priest detained Ward and placed him in the rear of the cruiser. Current and Priest then went down to the bottom of the creek to check the area where Ward had been dumping items from his pocket. They found three gel capsules floating right where Ward had been standing. Current had Latex gloves in his possession and used one to collect the capsules. Gel capsules are water soluble and they were already beginning to deteriorate when Current got them into the glove. Another officer then took photographs of the capsules at the scene.
{¶ 15} Because Ward was complaining about his arm, medics took him to Sycamore Hospital. Ultimately, Current went to the hospital and questioned Ward after administering Miranda warnings.
{¶ 16} Ward was indicted in November 2015 for one count of Possession of Heroin of less than one gram, a fifth-degree felony, and one count of Tampering with Evidence, a third-degree felony. After Ward pled not guilty, he filed a motion to suppress on December 11, 2015. The trial court held a hearing on January 20, 2016, at which the above evidence was elicited *130 from Officer Current. The court overruled the motion to suppress the same day.
{¶ 17} On January 27, 2016, Ward pled no contest to both charges, and was found guilty. The trial court subsequently sentenced Ward to up to five years of community control, with various conditions. Ward now appeals from his conviction and sentence.
II. Alleged Error in Overruling the Motion to Suppress
{¶ 18} Ward's sole assignment of error states that:
The Trial Court Erred in Overruling Appellant's Motion to Suppress.
A. Alleged Unlawful Detention
{¶ 19} Ward presents two issues under this assignment of error. The first is that the motion should have been granted because the police unlawfully seized him. Ward acknowledges that the police may validly detain individuals briefly for questioning, but argues that an unlawful seizure occurred in this case when Officer Current further investigated without reasonable articulable facts giving rise to a suspicion of criminal activity. In contrast, the State contends that Ward's first two encounters with the police were consensual and that the Fourth Amendment was not implicated. In addition, the State contends that Ward consented to the search of his person.
{¶ 20} In its decision, the trial court found Officer Current credible. The court also found that both of Current's initial encounters with Ward were consensual and did not implicate the Fourth Amendment. The court also concluded that Ward's consent was voluntary.
{¶ 21} "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." (Citation omitted). State v. Burnside , 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." (Citation omitted.) Id. "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." (Citation omitted.) Id.
{¶ 22} "The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution guarantee that 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated * * *.' " State v. Retherford , 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994).
{¶ 23} To decide if "a particular encounter constitutes a 'seizure,' and thus implicates the Fourth Amendment, the question is whether, in view of all the circumstances surrounding the encounter, a reasonable person would believe he or she was 'not free to leave,' United States v. Mendenhall , 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), or 'not free to decline the officers' requests or otherwise to terminate the encounter.' Florida v. Bostick , 501 U.S. 429, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)." State v. Westover , 2014-Ohio-1959, 10 N.E.3d 211, ¶ 13 (10th Dist.). If "a reasonable person would feel free 'to disregard the police and go about his business,' * * * the encounter is consensual and no reasonable suspicion is required." Bostick at 434, 111 S.Ct. 2382, quoting California v. Hodari D. , 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). " 'Only when the officer, by means *131 of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.' " Id. , quoting Terry v. Ohio , 392 U.S. 1, 19, fn. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
{¶ 24} "The United States Supreme Court has identified three categories of police contact with persons. The first is referred to as a 'consensual encounter,' in which there is no restraint on the person's liberty. There need be no objective justification for such an encounter." (Footnote omitted.) Retherford , 93 Ohio App.3d at 594, 639 N.E.2d 498. "The second type, called 'detention,' involves a seizure of the individual for a limited duration and for a limited purpose. A constitutionally acceptable detention can occur 'if there is an articulable suspicion that a person has committed or is about to commit a crime.' The third type involves seizures in the nature of an arrest, which may occur only if the police have probable cause to arrest a person for a crime." Id. at 594-595, 639 N.E.2d 498, citing Florida v. Royer , 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). (Other citations omitted.)
{¶ 25} In a consensual situation, "[p]olice officers may approach someone in a public place, identify themselves, ask whether the individual is willing to answer questions, and use any voluntary responses they receive in a criminal prosecution without the Fourth Amendment being implicated." Retherford at 595, 639 N.E.2d 498, citing Royer at 497, 103 S.Ct. 1319.
{¶ 26} "A consensual encounter remains consensual even if police officers ask questions, ask to see the person's identification, or ask to search the person's belongings, provided 'the police do not convey a message that compliance with their requests is required.' " Westover , 2014-Ohio-1959, 10 N.E.3d 211, at ¶ 15, quoting Bostick at 435, 111 S.Ct. 2382. (Other citations omitted.) In this regard, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' " Bostick at 437, 111 S.Ct. 2382, quoting Michigan v. Chesternut , 486 U.S. 567, 569, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988).
{¶ 27} There is no question that Current's initial stop of Ward was appropriate and that the Fourth Amendment was not implicated. This stop ended, however, when Current pulled up the street, found that Ward had no outstanding warrants, and began entering information into the computer. A second interaction then occurred.
{¶ 28} In arguing that the second interaction between Current and Ward was unlawful, Ward relies on United States v. Richardson , 385 F.3d 625 (6th Cir.2004) and State v. Robinette , 80 Ohio St.3d 234, 685 N.E.2d 762 (1997) ( Robinette III ).[1] In Richardson , an officer initiated a traffic stop of a car containing four individuals. The officer asked the driver to step out of the car and told him that he was going to issue a warning citation. Id. at 628. After asking the driver about his travel plans, the officer gave the driver the citation and shook his hand. The driver then turned around to return to his vehicle. At that point, the officer asked the driver a few more questions and then told the driver to wait or hang out behind while he asked the *132 owner of the car (who was not the driver) for permission to search the car. Id. at 627-628. Ultimately, the officer asked the occupants of the vehicle to step outside and when a search was conducted, a gun was found on one of the occupants (not the owner or driver), and that person (Richardson) was subsequently charged with possession of a firearm by a convicted felon. Id. at 628.
{¶ 29} Richardson filed a motion to suppress in the district court, which was granted, and the United States appealed. Id. The Sixth Circuit Court of Appeals noted that once the purpose for a traffic stop has been completed, the police cannot further detain motorists unless something occurred during the stop to cause an officer " 'to have a reasonable, articulable suspicion that criminal activity was afoot.' " Id. at 629, quoting United States v. Hill , 195 F.3d 258, 264 (6th Cir.1999).
{¶ 30} In this vein, the Sixth Circuit Court of Appeals concluded that the traffic stop in Richardson ended when the officer gave the driver the citation and shook his hand. Id. at 630. At that time, the driver was free to leave, but the officer then asked him to remain behind the vehicle. Id. Despite the fact that the officer's demeanor was not coercive, the Sixth Circuit stated that the officer's "words alone were enough to make a reasonable person in [the driver's] shoes feel that he would not be free to walk away and ignore Officer Fisher's request. When the driver is not free to leave, neither are his passengers; indeed, the passengers are at the mercy of any police officer who is withholding the return of their driver." (Citation omitted.) Id. at 630. As a result, the court held that a seizure had occurred, and the officer was required to have the required reasonable suspicion for the seizure. Id. The court then concluded that under the totality of the circumstances, the officer lacked a reasonable suspicion of criminal activity. As a result, the court affirmed the district court's decision to suppress evidence. Id. at 630-631.
{¶ 31} In Robinette III , a police office on drug interdiction patrol on Interstate 70 in Montgomery County, Ohio, stopped Robinette, who was speeding. Robinette III , 80 Ohio St.3d at 235, 685 N.E.2d 762. The officer had decided to issue only a verbal warning, which was his routine practice for speeders in that construction zone. Id. After finding no prior violations, the officer went back to Robinette's car and asked him to step out. The officer then activated his cruiser's video camera, returned to Robinette, issued a verbal warning, and gave Robinette back his license. Id. At that point, the officer asked Robinette if he were carrying any illegal contraband, and when Robinette said no, the officer asked if he could search the car. Id. Robinette agreed, and the officer found a small amount of marijuana. After finding this, the officer continued the search and found a pill, for which Robinette was charged with a violation of R.C. 2925.11(A). Id.
{¶ 32} Initially, the Supreme Court of Ohio held the search invalid as resulting from an illegal seizure, and established a test requiring officers to tell motorists that they are free to go after a detention, prior to further consensual interrogation. State v. Robinette , 73 Ohio St.3d 650, 654, 653 N.E.2d 695 (1995) ( Robinette I ). However, the United States Supreme Court rejected this test, stating that "the proper inquiry necessitates a consideration of 'all the circumstances surrounding the encounter.' " Ohio v. Robinette , 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) ( Robinette II ), quoting Bostick , 501 U.S. at 439, 111 S.Ct. 2382, 115 L.Ed.2d 389. The court then reversed the decision of the Supreme Court of Ohio and remanded the case for *133 further proceedings. Id. at 40, 117 S.Ct. 417.
{¶ 33} On remand, the Supreme Court of Ohio evaluated the case by considering whether the officer was objectively justified in detaining Robinette after administering the verbal warning. Robinette III , 80 Ohio St.3d at 240, 685 N.E.2d 762. The court concluded that the drug interdiction policy, pursuant to which the officer had stopped Robinette, promoted legitimate public concerns and justified a brief detention of Robinette to ask if he were carrying any illegal drugs or weapons. Id. at 241, 685 N.E.2d 762. The court then stated that "[i]f during the initial detention to ask the contraband question, the officer ascertained reasonably articulable facts giving rise to a suspicion of criminal activity, the officer may then further detain and implement a more in-depth investigation of the individual." Id. Applying this standard, the court held that the officer was not justified in detaining Robinette "to ask for and execute an intrusive search" because the officer "did not have any reasonably articulable facts or individualized suspicion to justify Robinette's further detention * * *." Id.
{¶ 34} The State has not argued on appeal that Officer Current had a reasonable, articulable suspicion to justify Ward's further detention, nor did Current testify in the trial court that was the case. Instead, the State simply argues that both encounters were consensual. We agree. Although the initial consensual encounter ended when Current pulled up the street, parked, found out that Ward had no outstanding warrants, and was entering information into his computer, there is no indication that the second encounter was anything but consensual under the standards set forth above. There was no show of force, nor was there any indication by the officer that Ward was not free to disregard the police and go about his business. Westover , 2014-Ohio-1959, 10 N.E.3d 211, at ¶ 15 ; Bostick , 501 U.S. at 437, 111 S.Ct. 2382, 115 L.Ed.2d 389.
{¶ 35} In State v. Taylor , 106 Ohio App.3d 741, 667 N.E.2d 60 (2d Dist.1995), we held that "[t]he Fourth Amendment guarantees are not implicated in [a consensual] encounter unless the police officer has by either physical force or show of authority restrained the person's liberty so that a reasonable person would not feel free to decline the officer's requests or otherwise terminate the encounter." Id. at 747, 667 N.E.2d 60, citing United States v. Mendenhall , 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Accord State v. Rappley , 2d Dist. Montgomery No. 25156, 2013-Ohio-964, 2013 WL 1092477, ¶ 17.
{¶ 36} There is no indication in the record that Current engaged in physical force or a show of authority, or that a reasonable person in Ward's position would not have felt free to decline Current's request or otherwise end the encounter. Current did not issue any orders, nor did he curtail Ward's freedom in any way when he asked if he could conduct a search. Ward's situation differs from situations like the passenger in Richardson , who clearly could not leave the scene, and who was told to remain.
{¶ 37} Accordingly, we agree with the trial court and the State that the Fourth Amendment was not implicated. In Rappley , we held that while the defendant's initial encounter with an officer was consensual, the encounter became non-consensual when the officer informed the defendant, without first asking permission, that he was going to pat him down. Id. at ¶ 23. We stressed that " 'a reasonable person would not have felt restricted by questions, but would have felt restrained by orders.' " Id. , quoting *134 State v. Montgomery , 2d Dist. Montgomery No. 15232, 1996 WL 283943, *3 (May 31, 1996).
{¶ 38} In contrast to the officer in Rappley , Current did not issue any orders, and did ask permission before conducting a search. Current did not specifically state that he was going to pat down Ward, but this was the clear implication of his request.
{¶ 39} Accordingly, we find no merit in Ward's argument that the two initial encounters with the police were non-consensual.
B. Consent
{¶ 40} Ward's second contention is that his consent to the search was involuntary. Again, Ward relies on Robinette III , and argues that the short transition time between the encounters, coupled with the officer's superior position of authority and the circumstances surrounding the request for the search would compel any reasonable person to submit.
{¶ 41} Citing State v. Sears , 2d Dist. Montgomery No. 20849, 2005-Ohio-3880, 2005 WL 1797037, ¶ 37, the trial court concluded that Ward's consent was voluntary because it "was not obtained by force, threat or any claim that if consent had been denied the patdown search would've been conducted in any event." Transcript of Proceedings, p. 51.
{¶ 42} "To rely on the consent exception of the warrant requirement, the state must show by 'clear and positive' evidence that the consent was 'freely and voluntarily' given." State v. Posey , 40 Ohio St.3d 420, 427, 534 N.E.2d 61 (1988), citing Bumper v. North Carolina , 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). (Other citations omitted.) This issue of " 'whether a consent to search was in fact "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined under the totality of the circumstances.' " Id. , quoting Schneckloth v. Bustamonte , 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).
{¶ 43} "The following factors are generally used in Ohio to decide if a defendant's consent to search has been given voluntarily: '(1) whether the defendant's custodial status was voluntary; (2) whether coercive police procedures were used; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his or her right to refuse consent; (5) the defendant's education and intelligence; [and] (6) the defendant's belief that no incriminating evidence will be found.' " State v. Mabry , 2d Dist. Montgomery No. 26242, 2015-Ohio-4513, 2015 WL 6592460, ¶ 15, quoting State v. Black , 2d Dist. Montgomery No. 23524, 2010-Ohio-2916, 2010 WL 2546501, ¶ 36-41.
{¶ 44} The trial court did not make specific findings on these factors. In situations where a trial court failed to address the totality of the circumstances and to make essential findings on voluntariness, some appellate courts have remanded the case for findings on whether the defendant voluntarily consented to the search. See, e.g., State v. Limoli , 10th Dist. Franklin No. 11AP-924, 2012-Ohio-4502, 2012 WL 4502938, ¶ 36-44. In Mabry , we noted that the trial court did not make specific findings as to voluntariness, but decided that the defendant's consent was voluntary because he was not placed in custody, in handcuffs, or in a police cruiser, and because nothing in the record indicated any coercive police procedures. Id. at ¶ 18.
{¶ 45} Likewise, there is no reason here to remand, as the record indicates there were no coercive police procedures, nor was Ward placed in handcuffs or in custody in any way. As a result, Ward's consent to the search was voluntary.
*135 {¶ 46} We do note that Ward refused to allow Current to remove the box-cutters from his pocket during the search. The trial court did not discuss this point, and did not consider whether consent was revoked.
{¶ 47} Specifically, during the search, when Current discovered the box-cutters, which were inside Ward's pockets, Ward told Current that he could not remove them. When Ward told Current no, Current "had a hold of [Ward's] arms." Transcript of Proceedings, p. 41. Current then "folded [Ward's] arm back away from the knives." Id. Thus, even though consent was initially voluntary, it could be argued that Ward withdrew his consent to the search. See State v. Jacko , 2d Dist. Montgomery No. 24371, 2011-Ohio-6494, 2011 WL 6365143, ¶ 26 (noting that "[a] suspect may revoke his consent to a search or limit the scope of the search to which he consents").
{¶ 48} However, Ward allowed Current to remove the box-cutters after Current explained that it was for Current's safety-again consenting. More importantly, we conclude, under the totality of the circumstances, that by the time Officer Current asked to remove the box-cutters, Current was entitled to do so for purposes of his own safety.
{¶ 49} "A seizure occurs when, in view of all of the circumstances surrounding the incident, the police officer has either by physical force or a show of authority restrained the person's liberty so that a reasonable person would not feel free to decline the officer's requests and walk away or otherwise terminate the encounter. * * * Factors that might indicate a seizure include the threatening presence of several police officers, the display of a weapon, some physical touching of the person , the use of language or tone of voice indicating that compliance with the officer's request might be required, approaching the person in a non-public place, and blocking the citizen's path." (Emphasis added.) State v. Belcher , 2d Dist. Montgomery No. 24385, 2011-Ohio-5015, 2011 WL 4529405, ¶ 22.
{¶ 50} The question arises in this context whether Ward was lawfully seized at that point. As was noted, the second type of police contact, "called 'detention,' involves a seizure of the individual for a limited duration and for a limited purpose. A constitutionally acceptable detention can occur 'if there is an articulable suspicion that a person has committed or is about to commit a crime.' " Retherford , 93 Ohio App.3d at 594-595, 639 N.E.2d 498. "Without a warrant, probable cause, and/or exigent circumstances, a search of a suspect's luggage (or jacket pockets) is not reasonable." Id. at 596, 639 N.E.2d 498, citing Royer , 460 U.S. at 497, 103 S.Ct. 1319, 75 L.Ed.2d 229.
{¶ 51} "To justify a particular intrusion, the officer must demonstrate 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' " State v. Batchili , 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, ¶ 11, quoting Terry , 392 U.S. at 21, 88 S.Ct. 1868, 20 L.Ed.2d 889. "And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate * * *." (Citations omitted.) Terry at 21-22, 88 S.Ct. 1868. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Id. at 27, 88 S.Ct. 1868. Accord *136 State v. Ojezua , 2016-Ohio-2659, 50 N.E.3d 14, ¶ 27 (2d Dist.)
{¶ 52} "Courts generally consider factors such as the high-crime nature of the area, the time of day, the experience of the officers involved, whether the officer was away from his cruiser, and suspicious activities by the defendant, such as furtive gestures." State v. Wilcox , 177 Ohio App.3d 609, 2008-Ohio-3856, 895 N.E.2d 597, ¶ 18 (2d Dist.), citing State v. Bobo , 37 Ohio St.3d 177, 524 N.E.2d 489 (1988). (Other citation omitted.)
{¶ 53} In this regard, Current did not indicate that the area where the search occurred was a high crime area, nor did he indicate that Ward had made any furtive gestures or was engaged in suspicious activities. In addition, Current had no prior knowledge of Ward, although he was aware that Ward was visiting a place where the place had made prior criminal calls. However, the search occurred late in the evening, and Officer Current was away from his vehicle at the time.
{¶ 54} In addition, during questioning by the trial court, Current stated that he had "some concern" about Ward's access to the box-cutters during the patdown. Once Current discovered the box-cutters, he had "a reasonable, objective basis to reasonably suspect that [Ward] might be armed and dangerous." State v. Robinson , 9th Dist. Wayne No. 10CA0022, 2012-Ohio-2428, 2012 WL 1970447, ¶ 17. See also State v. Bobo , 37 Ohio St.3d 177, 524 N.E.2d 489 (1988), paragraph two of the syllabus (noting that "[w]here a police officer, during an investigative stop, has a reasonable suspicion that an individual is armed based on the totality of the circumstances, the officer may initiate a protective search for the safety of himself and others.")
{¶ 55} Thus, under the totality of the circumstances, we conclude that even if Ward were seized, Current had a reasonable suspicion of danger to himself, and Ward was legally searched.
{¶ 56} After Ward was lawfully searched, he ran from Current and threw the heroin capsules in the creek. As was noted, the trial court held that this constituted voluntary abandonment. However, we need not consider this point, because we have concluded that the encounters were consensual, that Ward consented to the search of his person, and that even if consent arguably could be said to have been withdrawn, Current had a reasonable, articulable suspicion of criminal activity and danger to himself once he discovered the box-cutters. Accordingly, Ward's Fourth Amendment rights were not violated, and the trial court properly overruled the motion to suppress.
{¶ 57} Based on the preceding discussion, Ward's sole assignment of error is overruled.
III. Conclusion
{¶ 58} Ward's sole assignment of error having been overruled, the judgment of the trial court is affirmed.
HALL, P.J., concurs.

This is the last of various decisions in the same case, and, for purposes of clarity, will be referenced as Robinette III .