**[Cite as *State v. Williams*, 2020-Ohio-3903.]**

## IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28550 |
| | : | |
| v. | : | Trial Court Case No. 2017-CR-2253/2 |
| | : | |
| ALIA WILLIAMS | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

## O P I N I O N

Rendered on the 31st day of July, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by JAMIE J. RIZZO, Atty. Reg. No. 0099218, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

CARL BRYAN, Atty. Reg. No. 0086838, 120 West Second Street, Suite 603, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} This case is before us on the appeal of Defendant-Appellant, Alia Williams, from her conviction, on her no contest plea, for attempted possession of heroin (100 unit doses but <500 unit doses), a third-degree felony. According to Williams, the trial court erred in denying her motion to suppress evidence.

{¶ 2} After reviewing the record, we conclude that Williams' consent to the search of her residence was voluntary under the totality of the circumstances, and therefore the motion to suppress was properly denied. Accordingly, the judgment of the trial court will be affirmed.

I. Facts and Course of Proceedings

{¶ 3} On August 8, 2017, an indictment was filed charging Williams with one count of possession of heroin (100 unit doses but <500 unit doses) and one count of possession of Fentanyl. These offenses were second and fifth-degree felonies, respectively. After pleading not guilty, Williams filed both a motion to suppress and an amended motion to suppress on September 25, 2017. A suppression hearing for Williams and her co-defendant, Tony Sanders, was then held on two days: November 1, 2018, and March 4, 2019. Neither defendant presented witnesses at the suppression hearing; instead, the court heard testimony only from Montgomery County Sheriff's officers who were present at the scene. These officers were: Det. Andrew McCoy, Sgt. William Ables, and Det. Samuel Hemingway.

{¶ 4} After hearing the evidence and considering a post-hearing memorandum that Williams submitted, the trial court overruled the motion to suppress on June 28, 2019. Williams thereafter pled no contest to the reduced charge of attempted heroin possession

and was sentenced to various community control sanctions.

{¶ 5} The following account is based on the facts elicited during the suppression hearing. On the afternoon of July 14, 2016, Det. McCoy and Det. Hemingway were in the area of Falmouth and Hillcrest Avenues in Dayton, Ohio, in an unmarked car. Both detectives were assigned to the R.A.N.G.E. Task Force, which is a multijurisdictional task force in Montgomery County that focuses on narcotics and weapons violations. McCoy had been assigned to the task force for eight years, while Hemingway had been on the force for nine years.

{¶ 6} The detectives were there that day based on complaints from citizens in the area about car-to-car drug transactions. McCoy was driving, and he parked the car on Falmouth to see if any drug transactions would occur. At about 1:30 p.m., a yellow Ford Focus with two occupants drove past, turned around, and parked two to three feet behind the detectives' vehicle. The occupants did not get out of the Focus and appeared to be waiting.

{¶ 7} As McCoy watched in his rearview mirrors, a newer white Toyota pulled up next to the Focus, with the driver's-sides doors next to each other. The Toyota was being driven by an individual who was later identified as Derek Campbell. The drivers of the cars then exchanged something hand-to-hand, and both vehicles drove off in opposite directions.

{¶ 8} Det. McCoy stated that he has observed this type of behavior numerous times per week and has stopped the person afterward. Often, the transaction has involved drugs. Once this particular transaction ended, the detectives elected to follow the driver of the Focus, who was the buyer, because narcotics sellers often flee when

police try to stop them. After pulling out onto Hillcrest Avenue, McCoy ended up passing the Focus and turned down Deering Avenue, which was about two blocks away from the drug transaction. At that point, McCoy intended to turn around and follow the Focus. However, the detectives saw the white Toyota coming down Deering and decided to follow Campbell, since they could see his car. Campbell then pulled into the driveway of 2221 Deering. McCoy pulled up behind Campbell, blocking his car.

{¶ 9} The detectives arrived at the Deering address at about 1:40 p.m. Transcript of Suppression Hearing ("Tr."), p. 37-38. Although their car was unmarked, both detectives wore clearly marked police vests when they exited. Because they believed they had observed a hand-to-hand drug transaction, they wanted to do further investigation. McCoy went to the driver's side of the Toyota, while Hemingway approached on the passenger side. Campbell was alone in the car. McCoy observed that Campbell was clutching currency in his right hand. When Campbell noticed McCoy, he dropped the money beside the seat. *Id.* at p. 10-11.

{¶ 10} After making contact, the detectives removed Campbell from the vehicle. When they initially spoke with Campbell, he only identified himself as "J.T." and gave them fraudulent information about his identity. *Id.* at p. 91. Specifically, the name he gave belonged to a deceased person. *Id.* Campbell also told them that he had pulled into a random driveway to turn around and did not know anyone at the residence. *Id.* at p. 11 and 91. In addition, Campbell said he did not know who owned the car he was driving. *Id.* at p. 11.

{¶ 11} Shortly after the detectives made contact with Campbell, Det. Thornton, a uniformed K-9 officer, arrived. The detectives had also requested the presence of

another cruiser so they could secure Campbell until his identify could be verified. The police searched the Toyota, looking for any identification or rental documents, but nothing was in the car except less than $100 in currency. *Id.* at p. 26-27 and 45. While Hemingway was trying to identify Campbell, McCoy knocked on the rear door of the house to see if anyone was inside, but he did not get an answer. *Id.* at p. 12.

{¶ 12} About ten to fifteen minutes after McCoy and Hemingway arrived, Williams came to the scene. At that point, the detectives explained to Williams why they were there and about the narcotics investigation. Williams said she lived at the house, had hired Campbell to mow the lawn, and had rented the Toyota. Tr. at p. 13, 27, 31, and 92. Williams was not able to provide Campbell's full identification information. *Id.* at p. 93. She also said she had left the Toyota's keys with Campbell so that he could move the car if he needed to do so while he mowed the lawn. *Id.* at p. 14. Williams initially told the police that she had an old address on her driver's license, i.e., not the Deering address. *Id.* In addition, Williams did not have paperwork for the rental car. *Id.* at p. 30.

{¶ 13} Once Williams said that she had hired Campbell to mow the lawn and had given him the car keys, Det. McCoy knew that Campbell was lying. Tr. at p. 28. The fact that a rental vehicle was involved was also notable, because narcotic traffickers in Montgomery Country often drive rental cars. *Id.* at p. 12. Furthermore, Campbell was the drug seller. *Id.* at p. 60. Based on Det. Hemingway's experience, persons dealing in hand-to-hand transactions often return to where they normally store drugs. People also lie to the police to prevent them from identifying places used to store drugs. *Id.* at p. 112-113. In view of these facts, both the residence and the car were of interest.

{¶ 14} Dep. Shiverdecker arrived shortly after the detectives' initial conversation with Williams, and Campbell was then placed in Shiverdecker's cruiser. At that point, Campbell was being detained because of the investigation and because he had given fraudulent information. *Id*. at p. 93.

{¶ 15} By this time, Sgt. Ables, the supervisor for McCoy and Hemingway, had also arrived. Ables came because McCoy and Hemingway had asked him to help with the investigation. *Id*. at p. 70, 71, and 106. When Ables arrived, several things were going on: a couple of unmarked cars were there, and some family members were out on the street. *Id*. at p. 71. Many of Williams' family members had arrived at the scene; initially, these individuals were disruptive and kind of loud and boisterous. *Id*. at p. 22, 52, 102, and 103.

{¶ 16} During her discussion with the police, Williams said that no one should be inside the house. Tr. at p. 99. This later proved to be untrue. Williams also said her house key was on the key ring in the Toyota. *Id*. at p. 15. Again, this later proved to be untrue. According to Det. McCoy, it was important to find out if the key fit because Campbell was lying about his identity, Williams said she had rented the car but did not have any rental paperwork, and Williams said she lived at the house but did not have the address on her driver's license. As a result, the police were trying to determine who actually lived there. *Id*. at p. 30.

{¶ 17} Once Ables arrived, Williams agreed to let him and McCoy walk up to the porch with her so she could try to unlock the front door. *Id*. at p. 15. This occurred around 2:30 p.m. *Id*. at p. 46. When they got to the front door, there was a window to the right on a nook at the corner of the house. This window faced the porch. McCoy

could see through the window and observed that "a kitchen style trash bag, like the white trash bags for a kitchen garbage can, was laying on a table inside the residence, and there was a bunch, like hundreds of empty gel caps kind of strewn – coming out of the bag, all over the table. And there was also a box of plastic sandwich bags sitting beside it." *Id.* at p. 15.

{¶ 18} McCoy found this notable, because in his experience, drug traffickers often package individual doses of narcotics in gel caps. There were also hundreds of gel caps in the bag, which was unusual. *Id.* at p. 16. Furthermore, drug traffickers also often package narcotics in plastic sandwich bags; they put doses of drugs into gel capsules and then put the capsules in sandwich bags. *Id.* Sgt. Ables also saw hundreds of gel caps and the sandwich baggies through the window. *Id.* at p. 74-75.

{¶ 19} After several attempts with different keys, none of the keys worked. Williams then said she did not have a key to the house. After discussing the matter further, the police discovered that Williams, in fact, was a resident of the house, that she had a driver's license bearing the Deering Avenue address, and that she did have a key to the house. Tr. at p. 72.

{¶ 20} While Ables, McCoy, and Williams were on the porch, Det. Hemingway was at the side of the house on the driveway. Through a window, Hemingway noticed an individual inside the house, moving to its rear. *Id.* at p. 93-94. Hemingway identified himself and asked the individual (later identified as Tony Sanders, Williams co-defendant) to come to the front door. *Id.* at p. 94. Sanders then exited from the front of the house, and the detectives there contacted him. As Sanders came out of the house, he said he had been on the phone speaking with a defense attorney; Sanders then told the police

they could not search the house without a search warrant.   *Id.* at p. 18.

{¶ 21} At that point, Det. McCoy's intention had been to go back to his office and draft a search warrant.   *Id.*   McCoy told Sanders that he was going to get a search warrant, and the police were not going to search inside the house without one.   *Id.* at p. 19.   Sanders told McCoy that he did not have enough for a search warrant, and in response, McCoy said that he could see the empty gel capsules.   *Id.*   Sanders then argued that the capsules were not illegal; they were empty and he had them because he was a diabetic.   *Id.*   McCoy then left to go to his office to type up a search warrant.   The time was about 2:45 p.m.   *Id.* at p. 38.

{¶ 22} McCoy could not recall if he discussed consent with Williams before he left to get the search warrant.   However, Hemingway explained to Williams that the police could possibly be obtaining a warrant to search the house, and that her other option was to consent.   Tr. at p. 47 and 99.   Hemingway initially discussed consent with Williams one-on-one.   She was free to walk about and was not being detained.   *Id.* at p. 100.   At some point, there may have been other officers or a deputy with Hemingway.   Because Williams' family members were there, the police had to maintain the scene while speaking with Williams and Sanders.   *Id.* at p. 101.   No threats or promises were made to Williams.   *Id.* at p. 103.

{¶ 23} Det. Hemingway did not remember Williams' exact words about her consent.   He explained to Williams what had been observed about the drug transaction, the reasons the police were at her house, what had been observed once they were there, and that detectives were in the process of obtaining a search warrant based on the information he had provided her.   *Id.* at p. 125.   Hemingway conceded that it was

possible that he told Williams her house would be in less disarray if she consented, because less disarray occurs if people cooperate and tell the police where certain things are. However, Hemingway also stressed that he had told this to people before, and they still refused consent. *Id.* at p. 132-133.

{¶ 24} In any event, by the time Det. McCoy got to his office, which was about 10 to 15 minutes away, Ables had called and told him to return because they had obtained Williams' consent to search. *Id.* at p. 19. McCoy then drove back to the scene, and the consent form was signed at around 3:16 p.m. *Id.* at p. 38 and 101. *See also* State's Ex. 1 (the signed consent form). Hemingway had previously explained the consent form to Williams. *Id.* at p. 100.

{¶ 25} Williams was allowed to be present during the search in case she wanted to revoke consent. However, Sanders left the scene before the search began. Tr. at p. 21, 22, and 103. During the search, Williams was free to go wherever she wanted in the house and was able to observe whatever was being processed; Hemingway accompanied her. *Id.* at p. 22 and 103. McCoy told Williams that the police would stop anytime she asked, but she did not revoke her consent. *Id.*

{¶ 26} Drugs were found during the search, and Williams and Sanders were both charged with possession of the drugs. As noted, after her suppression motion was overruled, Williams pled no contest to attempted possession of heroin and was sentenced to various community control sanctions. This appeal followed.

II. Consent

{¶ 27} Williams' sole assignment of error states:

The Trial Court Erred in Overruling Ms. Williams' Motion to Suppress

Evidence Obtained During the Warrantless Search of Her Home Based on

Its Finding That She Freely and Voluntarily Gave Consent to Search Her

Home.

{¶ 28} Under this assignment of error, Williams contends that evidence obtained as a result of the search should have been suppressed because her custodial status was not voluntary and she was coerced into giving consent.

{¶ 29} "Appellate review of a motion to suppress presents a mixed question of law and fact.   When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses."   *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.   "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. * * * Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard."   *Id.*

{¶ 30} In overruling the suppression motion, the trial court first addressed any statements that Williams made to the police.   The court concluded that Williams was not subject to any custodial interrogation when she made statements to the police because she was outside her home and was not in a restricted environment.   Furthermore, there was no evidence that the police either threatened Williams or verbally dominated the interview, and a reasonable person would have felt free to leave.   The court also found that Williams voluntarily consented to a search of the house and that a fair probability existed that contraband would be found in the house even without the officers'

observation of drug packaging materials.   Order Overruling Motion to Suppress, p. 11.

{¶ 31} Both the Fourteenth Amendment to the United States Constitution and Article I, Section 14, Ohio Constitution, protect persons from unreasonable searches and seizures.   *State v. Leak*, 145 Ohio St.3d 165, 2016-Ohio-154, 47 N.E.3d 821, ¶ 13. "Under the Fourth Amendment to the United States Constitution, a search conducted without prior approval of a judge or magistrate is per se unreasonable, subject to certain well-established exceptions."   *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 181, citing *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 567 (1967).   (Other citation omitted.)

{¶ 32} "One such exception was recognized in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which held that 'where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot. . . ,' the officer may briefly stop the suspicious person and make 'reasonable inquiries' aimed at confirming or dispelling his suspicions."   *Minnesota v. Dickerson*, 508 U.S. 366, 372-373, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993), quoting *Terry* at 30.

{¶ 33} In general, the reasonableness of a search or seizure depends on the circumstances and facts of each case, and " 'is measured in objective terms by examining the totality of the circumstances.' "   *Leak* at ¶ 13, quoting *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996).

{¶ 34} Here, the detectives had reasonable suspicion to stop and investigate Campbell and the white Toyota, since they had observed Campbell engaged in a suspected drug transaction moments earlier.   Once they began to question Campbell,

they had further suspicion that criminal activity was afoot, based on the fact that Campbell had provided them with false information. This suspicion was further enhanced when Williams appeared within about 15 minutes, because Williams contradicted the information that Campbell had given the officers.

{¶ 35} More importantly, Williams herself provided the officers with further grounds for suspicion, because she did not have rental documents for the Toyota, despite claiming that she had rented it. Given the facts that narcotics traffickers often use rental automobiles and that Williams was unable to provide proof that she lived at the residence, the police were entitled to conduct further investigation. Thus, as the trial court observed, there was no evidence that Williams was in a custodial situation when the police talked to her. The police were entitled to conduct a reasonable investigation.

{¶ 36} In this regard, we also note that Williams' description of the facts is incorrect. For example, Williams states that the initial stop and Sanders' demand that the police obtain a warrant occurred at 1:30 p.m. and prior to the police escorting Williams to the porch to unlock the house. Appellant's Brief, p. 4, citing Tr. at p. 17, 33-34, and 118. Those parts of the transcript say no such thing. As noted above, the facts indicate that the police arrived at the house at about 1:40 p.m., that Williams arrived 10 to 15 minutes later (or close to 2:00 p.m.), that Williams unsuccessfully tried to unlock the house at around 2:30 p.m., and that Sanders came out of the house shortly thereafter, demanding that the police obtain a warrant.[1] Within moments, Det. McCoy left to type up a search warrant.

---

[1] The key situation in itself was suspicious, because even though Williams said that her house key was on the ring of keys in the Toyota, none of the keys worked on the door to the house. Clearly, Williams was being untruthful.

{¶ 37} Furthermore, the officers' ability to resolve their investigation was hampered by Williams' many family members, who were yelling at the police and were disruptive, loud, and boisterous, causing the police to have to manage the scene. Tr. at p. 22, 52, and 102. The police certainly did not ask these many family members to come. There was also no evidence presented that the police intimated or threatened Williams in any way.

{¶ 38} More importantly, another exception to the warrant requirement applies, and that is where a proper party has voluntarily given consent to search the property. *State v. Sneed*, 63 Ohio St.3d 3, 7, 584 N.E.2d 1160 (1992), citing *United States v. Matlock*, 415 U.S. 164, 165-166, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). "It is well settled that consent to a warrantless search will not be held invalid nor the resulting search unreasonable when one with authority over the premises voluntarily permits the search." *Id*.

{¶ 39} "To rely on the consent exception of the warrant requirement, the state must show by 'clear and positive' evidence that the consent was 'freely and voluntarily' given." *State v. Posey*, 40 Ohio St.3d 420, 427, 534 N.E.2d 61 (1988), quoting *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). "A 'clear and positive' standard is not significantly different from the 'clear and convincing' standard of evidence, which is the amount of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations to be proved. It is an intermediate standard of proof, being more than a preponderance of the evidence and less than evidence beyond a reasonable doubt." (Citations omitted). *State v. Ingram*, 82 Ohio App.3d 341, 346, 612 N.E.2d 454 (2d Dist.1992), citing *State v. Danby*, 11 Ohio App.3d 38, 41, 463

N.E.2d 47 (6th Dist.1983) and *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954).

{¶ 40} "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Our district has used six factors to evaluate the voluntariness of consent: " '(1) The voluntariness of the defendant's custodial status; (2) The presence of coercive police procedures; (3) The extent and level of the defendant's cooperation with the police; (4) The defendant's awareness of his right to refuse to consent; (5) The defendant's education and intelligence; and (6) The defendant's belief that no incriminating evidence will be found.' " *State v. Webb*, 2d Dist. Montgomery No. 17676, 2000 WL 84658, *3 (Jan. 28, 2000), quoting *United States v. Shabazz*, 993 F.2d 431, 438 (5th Cir. 1993). (Other citation omitted.) *See also State v. Ward*, 2017-Ohio-1391, 89 N.E.3d 124, ¶ 43 (2d Dist.)

{¶ 41} After considering the record, we agree with the trial court that Williams was not in custody. Williams was not restrained in any way, and there is no indication in the record that the police would not have allowed her to leave. Although Williams complains that she felt restrained due to the number of officers on the property, her co-defendant, Sanders, was not detained and left the scene, even though he was inside the house where suspected trafficking items had been seen; he also had admitted to the police that he sometimes stayed at the house. Tr. at p. 21 and 72. Therefore, there was every reason to suspect that Sanders was involved in illegal conduct.

{¶ 42} In addition, even though a number of police were present, there was no

evidence of coercive police procedures. While an officer with a drug-sniffing dog was requested, this was reasonable given the evidence of Campbell's involvement in a drug transaction. Furthermore, Det. McCoy and Det. Hemingway arrived in an unmarked car and needed a cruiser with a backseat to secure Campbell while they investigated. As a result, they called for another patrol car. *Id.* at p. 12 and 20. Sgt. Ables also indicated that when he went to the porch with Williams to try her key, she did not seem scared or intimidated. *Id.* at p. 71. Finally, the fact that Ables, the detective's supervisor, and perhaps another officer came to the scene was not unwarranted, since many of Williams' family members were there, confronting the police and being disruptive.

{¶ 43} There was also no evidence that Williams was uncooperative with the police. When she arrived at the scene, she offered that she had rented the car, had given the keys to Campbell, that she lived in the house, and that her house key was on the key ring in the Toyota. Williams also agreed to show the police that she had a key and agreed to accompany them to try the key on the door. *Id.* at p. 15. After Williams consented to the search, her conversation inside the house with the police was "rather friendly." *Id.* at p. 22.

{¶ 44} Williams would have been aware of her right to refuse consent, as the form was explained to her and it also stated that she had such a right. *See* Ex. 1. Moreover, Sanders told the police in Williams' presence that they could not search without a warrant. And finally, Williams was told during the search that she could revoke consent at any time.

{¶ 45} The record is devoid of any evidence about Williams' education or intelligence, and there was no specific evidence concerning her knowledge of incriminating evidence to be found. Circumstantially, Williams could have had such

knowledge, for two reasons. First, Williams lied about her key to the house being on the ring of keys in the Toyota. In addition, the bag of gel caps and the box of sandwich baggies were in plain sight on the table in the house. However, as the trial court noted, there was no direct evidence on this point. Order Overruling Motion to Suppress at p. 9.

{¶ 46} Williams has made much of the trespass by the police on her property, and she claims that she was coerced because the police threatened that her home would be "torn up" if she failed to consent to the search. She also argues that nothing connected the white Toyota to the house. This latter point is incorrect, however. Many things connected the Toyota to the house. First, the person driving the car pulled into the driveway. There was no evidence that Campbell was actually attempting to turn around. Furthermore, Williams herself stated that she lived at the house, had rented the car, had given the keys to Campbell, and that her house key was on the key ring in the Toyota.

{¶ 47} As a further matter, "the police may enter private property without such conduct constituting a search, provided that the officers restrict their movements to those areas generally made accessible to visitors, such as driveways, walkways, or similar passages." State v. Lewis, 2d Dist. Montgomery No. 22726, 2009-Ohio-158, ¶ 25 (police could appropriately be on grassy area between alley and defendant's fence). There was no indication here that the yard was fenced, and the only intrusion beyond areas normally accessible occurred when Det. McCoy went to the rear door of the house to knock on it. This was before Williams even arrived.

{¶ 48} Setting aside the observations made from the front porch, the only other pertinent observation occurred when Det. Hemingway stood on the driveway and saw a person inside the house. However, observations a police officer makes while standing

on a parking pad or driveway do "not constitute a search under the Fourth Amendment because the driveway [is] open to the public." *State v. Peterson*, 173 Ohio App.3d 575, 2007-Ohio-5667, 879 N.E.2d 806, ¶ 15 (2d Dist.).

{¶ 49} Both the State and trial court have relied on *State v. Grigley*, 2d Dist. Montgomery No. 26065, 2014-Ohio-3950, with respect to the fact that the police may have told Williams that they would obtain a warrant if she did not consent. Order Overruling Motion to Suppress at p. 10; State's Brief, p. 6.

{¶ 50} In *Grigley*, we commented that " '[w]hen an officer informs a suspect that he will obtain a search warrant if the individual does not consent to a search, this does not necessarily vitiate an otherwise voluntary consent.' " *Id.* at ¶ 27, quoting *State v. Clark*, 2d Dist. Montgomery No. 18314, 2000 WL 1643789, *7 (Nov. 3, 2000). " 'If the officer's statement simply advises the suspect of his precise legal situation, such a "threat" is not coercion. However, * * * if an officer advises a suspect he will obtain a search warrant if consent is not given, probable cause must exist to obtain that warrant.' " *Id.*

{¶ 51} Here, Det. Hemingway simply advised Williams of what the police had observed and the choices that were involved. Tr. at p. 99 and 125. Moreover, Hemingway did not threaten Williams, and he did not admit telling Williams that her house would be torn up if she failed to consent. To the contrary, Hemingway said that *he did not recall* telling Williams that her house might not be in a state of disarray if she gave consent. *Id.* at p. 132. He then simply acknowledged that it was a "possibility" that he may have said it because he had told people that before, and "because that is something when people are more cooperative and advise us where certain things are in the residence and we don't have to look for them, the house is not left in such disarray

because of the cooperation." *Id.* at p. 132-133.

{¶ 52} The trial court concluded that Det. Hemingway's comment about houses being in disarray was not an express threat. The court then concluded, without deciding if such a statement were an implied threat, that probable cause existed for a search warrant. Order Overruling Motion to Suppress at p. 9-10. In doing so, the trial court relied on the factors we have already discussed, including the observations of the drug transaction, the fact that Campbell returned to the Deering Avenue address, Campbell's untruthfulness, Williams' admission of renting the car and her connection, as a resident, to Campbell, the fact that Sanders was in the home when no one was supposed to be there, and the detectives' awareness of typical conduct and habits of drug traffickers. Order Overruling Motion to Suppress at 10-11. The court, thus, concluded that probable cause existed for a warrant, even absent what the officers observed while on the front porch.

{¶ 53} We agree with the trial court, with the exception that there was actually no evidence that Det. Hemingway made a statement about leaving the house in disarray. Hemingway said he did not recall making that statement and only acknowledged that it was a "possibility." Other than this, we agree with the trial court.

{¶ 54} "Probable cause to obtain a search warrant exists when after reviewing all of the surrounding circumstances, there is 'a fair probability that contraband or evidence of a crime will be found in a particular place.' " *Clark*, 2d Dist. Montgomery No. 18314, 2000 WL 1643789, at *7, quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). We note that Det. McCoy and Det. Hemingway had spent close to a decade on the narcotics task force and were well versed in the conduct of drug

traffickers. Their observations, as noted above, revealed a fair probability that narcotics would be found in the house. Consequently, we agree with the trial court that probable cause for a search warrant existed, even without considering what Sgt. Ables and Det. McCoy saw while standing on the porch.

{¶ 55} In light of the above circumstances, we find no error on the trial court's part in overruling the motion to suppress evidence. Accordingly, Williams' sole assignment of error is overruled.

## III. Conclusion

{¶ 56} Williams' assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J., concurs.

FROELICH, J., concurs in judgment only:

{¶ 57} The sole issue before us is whether Williams voluntary consented to the officers' entry into her residence. I agree that she did.

{¶ 58} Viewing the totality of the circumstances, the record reflects that Williams's consent was voluntarily given. Williams was not in custody or otherwise being detained. Moreover, I agree that the officers did not engage in coercive conduct. Officer McCoy indicated to Williams that he would get a search warrant, and he left the residence to do so. However, it was not unreasonable for the police to believe, in good faith, that they had grounds to request a warrant, and the statement to Williams that they were going to

request one was not a bluff, a hollow threat, or a tactic to obtain consent. Nor did Hemingway's statement that her home might be in less disarray, assuming that the statement was said at all, rise to the level of coercion. There is no indication that Williams did not understand the consent to search form, which she signed.

{¶ 59} I diverge from the majority opinion mainly in that I believe it addresses issues that do not need to be addressed to resolve Williams's assignment of error. The discussion of whether the detectives had a reasonable and articulable suspicion of criminal activity to warrant Campbell's stop and detention is irrelevant to Williams's consent. Likewise, the conduct of Williams's family members and of Sanders also had no apparent relation to Williams's decision to grant consent. I would also not make a finding, as the trial court apparently did, that probable cause existed for a warrant. Because I would confine our analysis to the voluntariness of Williams's consent, I concur in judgment only.

Copies sent to:

Mathias H. Heck, Jr.
Jamie J. Rizzo
Carl Bryan
Hon. Michael W. Krumholtz