[Cite as *State v. Alvarez*, 2024-Ohio-3208.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellant | : | C.A. No. 30092 |
| | : | |
| v. | : | Trial Court Case No. 2023 CRB 3998 |
| | : | |
| KEVIN ALEXANDER QUINAC | : | (Criminal Appeal from Municipal Court) |
| ALVAREZ | : | |
| | : | |
| Appellee | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on August 23, 2024

. . . . . . . . . . .

MARC ROSS, Attorney for Appellant

ARVIN S. MILLER, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} The State appeals from an order of the Dayton Municipal Court which granted parts of a motion to suppress in a domestic violence and assault case against Kevin Alexander Quinac Alvarez. Because Alvarez was not subject to custodial interrogation

when he implicated himself in domestic violence and assault against his wife, the judgment of the municipal court is reversed, and the matter is remanded for further proceedings.

**Procedural History**

{¶ 2} Alvarez was charged with one count of domestic violence and one count of assault on November 5, 2023; he pled not guilty. On November 15, 2023, he filed a motion to suppress statements he had made to law enforcement officers, and a hearing on the motion was held on November 20, 2023. On April 1, 2024, the court granted parts of Alvarez's motion to suppress. The court granted the motion as to Alvarez's response to a question regarding what had happened "in his own words." The court overruled the motion as to statements Alvarez made in response to questions about his name, identification, and the name, birthdate, and parentage of a child present at the scene. The State appealed.

{¶ 3} On May 12, 2024, Alvarez filed a motion to dismiss the State's appeal, arguing that the appeal was moot because he had been incarcerated for more than the maximum time for which he could be sentenced if found guilty; he had been arrested on November 6, 2023, and was released on May 10, 2024. We took the motion to dismiss under advisement, to be considered with the merits of the appeal.

{¶ 4} On July 22, 2024, the State filed a motion to voluntarily dismiss its appeal pursuant to App.R. 28. According to the State's motion, Alvarez had already served more than the maximum sentence of 180 days in jail for his conviction, and therefore he had to be discharged pursuant to R.C. 2945.73(B), rendering the appeal moot.

{¶ 5} R.C. 2945.73(B) governs discharge for delay in trial and provides:

(2) Regardless of whether a longer time limit may be provided by sections 2945.71 and 2945.72 of the Revised Code, a person charged with a misdemeanor shall be discharged if the person is held in jail in lieu of bond awaiting trial on the pending charge:

(a) For a total period equal to the maximum term of imprisonment which may be imposed for the most serious misdemeanor charged;

. . .

(3) A discharge under division (B)(2) of this section is a bar to any further criminal proceedings against the person based on the same conduct.

{¶ 6} "If the speedy trial time limits of R.C. 2945.71 and 2945.72 are exceeded, a person charged with an offense must be discharged." *State v. Mitchell*, 2012-Ohio-2107, ¶ 16 (2d Dist.), citing R.C. 2945.73. "The statutory speedy trial provisions are mandatory and must be strictly complied with by the trial court." *Id.,* citing *State v. Singer*, 50 Ohio St.2d 103, 105 (1977) ("In a series of cases, we have imposed upon the prosecution and the trial courts the mandatory duty of complying with R.C. 2945.71 through 2945.73.") We conclude that the State's argument regarding Alvarez's discharge is not properly before this court because speedy trial provisions are to be enforced by the trial court.

{¶ 7} Further, App.R. 28 governs the voluntary dismissal of appeals. It states:

If the parties to an appeal or other proceeding shall sign and file with the clerk of the court of appeals an agreement that the proceedings be dismissed and shall pay whatever costs are due, the court shall order the

case dismissed.

An appeal *may* be dismissed on motion of the appellant upon such terms as may be fixed by the court.

(Emphasis added.)

{¶ 8} No dismissal agreement between the parties of the sort referred to in App.R. 28 has been filed, and the dismissal of an appeal on an appellant's motion rests within the sound discretion of the court of appeals. *Danis Montco Landfill Co. v. Jefferson Twp. Zoning Comm.,* 85 Ohio App.3d 494 (2d Dist. 1993). Even if the State's argument were properly raised in this court, the facts necessary to resolve the motion for voluntary dismissal are not part of the appellate record. Accordingly, we overrule the State's motion and proceed to address the merits of the State's appeal.

## Assignment of Error and Analysis

{¶ 9} The State raises a single assignment of error:

TRIAL COURT ERRED IN GRANTING IN PART APPELLEE'S MOTION TO SUPPRESS EVIDENCE WHEN IT FOUND THAT APPELLEE WAS SUBJECTED TO CUSTODIAL INTERROGATION.

{¶ 10} The State asserts that an officer's asking "what happened?" is not interrogation. It argues that the trial court erred in finding that Alvarez had been subjected to custodial interrogation that had required *Mirranda* warnings be given and that, if he was not in custody, his statement implicating himself in response to the officer's general inquiry as to what happened was admissible. The State requests that the

decision of the municipal court be reversed.

{¶ 11} Alvarez responds that the municipal court correctly suppressed his response to the police questions, as he was in custody and detained. He asserts that, after the victim identified him as her assailant, he was not free to leave, as verified by the police officers at the scene. Alvarez notes that he observed the officers attend to the victim and photograph her injury, and he saw a third officer come to the room to act as an interpreter; the victim related to the interpreter that she and Alvarez had argued before he hit her. At this point, according to Alvarez, he knew he was not free to terminate the interview and leave, and a reasonable person would have believed that arrest was imminent. Alvarez asserts that, considering all the information the officers had at that time, there was no reason for them to ask him for his side of the story other than to elicit an incriminating response.

Suppression Hearing

{¶ 12} At the suppression hearing, Officer Hannah Mauri, a patrol officer for the Dayton Police Department, testified that on the afternoon of November 5, 2023, she and her partner, Officer Zachary Faltys, were dispatched to an address on York Avenue on a report of domestic violence. They were in a marked cruiser and dressed in the uniform of the day. Mauri testified that it had been reported by a female (who required language interpretation services) that her husband had hit her and was no longer at the scene.

{¶ 13} Mauri stated that the police department employs a Neighborhood Associate Officer (NAO) for interpretation services, and she and Faltys requested his presence prior to arriving on the scene. After initially responding to the wrong address, the officers were

flagged down by a young male to the correct address; Mauri testified that she and Faltys walked into the building and upstairs, where multiple people were located in one bedroom. The officers learned that no one there spoke English. Mauri testified that the victim was pointed out in the room, and Mauri spoke to her via Google Translate to obtain basic information while waiting for the interpreter.

{¶ 14} Officer Mauri testified that the victim had injuries consistent with the initial domestic violence complaint. After the interpreter arrived, Mauri obtained the victim's statement. According to Mauri, in addition to the three or four other people who remained in the room, a child came in and out of the room freely, and five to seven men came in and out of the room while officers were speaking to the victim. Mauri initially believed that the perpetrator was not present.

{¶ 15} With the assistance of the NAO, Mauri questioned the victim about what happened and where Alvarez may have gone. Although reluctant to answer questions, the victim "gestured" toward a male in the room, and the interpreter stated, "that's him, that's who did it," surprising Mauri and Faltys. According to Mauri, up to that point, Alvarez had been free to leave the room like everyone else present. Upon learning Alvarez's identity, Mauri "simply asked [the NAO] . . . if he could ask what happened," and she requested Alvarez's identification. Alvarez had not been placed in handcuffs, and the officers had not drawn their weapons, touched him, or told him he could not leave before the NAO asked him what had happened. Alvarez "got up and left and grabbed his wallet" from the closet and was "moving freely within the room."

{¶ 16} Video from Mauri's body camera was played for the jury. The video

depicted Alvarez providing his identification to Faltys and then getting up to get a bottle of water. Mauri stated that Alvarez had not been in custody at that time. The video depicted the NAO asking Alvarez what had happened. According to Mauri, after Alvarez told the officers his side of the story and what had happened, they asked him to stand up and put his hands behind his back; at that point, Alvarez was under arrest. Mauri reiterated that up until that moment, Alvarez had not been in custody.

{¶ 17} Officer Mauri testified that Alvarez was not Mirandized after being placed under arrest, and he was not asked any questions. She and Faltys escorted him to their cruiser, again without asking any questions. Mauri then returned upstairs to complete a domestic violence packet with the victim while Faltys remained with Alvarez. The officers did not ask any questions of Alvarez while he was transported to the jail or in the holding area.

{¶ 18} On cross-examination, Mauri stated that Alvarez had been on the other bed in the room when the victim identified him as her assailant. The exchange continued:

Q. And you testified on your direct that he was free to leave because he moved freely within the room?

A. Yes.

Q. But he couldn't leave the room because you were questioning him.

A. No. Just because we are questioning someone it doesn't mean they are detained.

. . .

Q. . . . So, in the case at hand, it didn't really matter what he had to say

when he was on the bed with multiple officers . . . around him and blocking the exit from the room because he was not free to leave.

A. No. It still matters. We still get what everyone says, especially if there are other people in the room too.

Q. . . . Even if he had refused to speak to officers, he was going to be arrested.

A. Yes.

**{¶ 19}** Officer Mauri testified that Officer Faltys was standing near the door to the bedroom, but he was not blocking the door. She acknowledged that there was only one way to enter or exit the bedroom. She testified that she had directed the NAO to ask Alvarez what happened after pictures of the victim's injuries had been taken, without advising him of his rights.

**{¶ 20}** On redirect, Mauri testified that, once Alvarez was identified as the person that the victim was accusing, he was being detained for investigative purposes; he had been free to leave up to that point. Alvarez was not in handcuffs when the officers asked him questions. Mauri stated that "[t]hey were vague questions, not direct. So we do not do Miranda rights."

**{¶ 21}** Officer Zachary Faltys testified that, upon arrival at the York Avenue address, he was aware that no one spoke English, and he believed that the assailant had left the scene. He stated that three males were on one bed close to the bedroom door, and the victim was on a separate bed close to a window.

**{¶ 22}** Faltys testified that, while Mauri questioned the victim, he was observing,

watching people come and go, and looking for any threat someone might pose. Faltys did not learn that the alleged perpetrator - Alvarez - was present for 13 to 14 minutes. He testified that, after the NAO arrived, he pointed Alvarez out, sitting on the end of the bed, and Faltys asked if he had any identification; Alvarez retrieved identification from the closet and gave it to Faltys. According to Faltys, Alvarez had not been detained and was not in custody prior to being identified as the assailant. Faltys's body camera video was played for the jury.

{¶ 23} Faltys testified that, once officers were sure that the crime they were investigating had been committed and had been committed by Alvarez, he was placed in handcuffs. Prior to that, Faltys did not touch Alvarez or prevent him from leaving. Faltys did not advise Alvarez of his rights or ask him any questions; he simply led him out of the house and placed him in his cruiser. Faltys remained with Alvarez until he was transported to the jail, and no questions were asked of Alvarez.

{¶ 24} On cross-examination, Faltys acknowledged that as soon as the victim relayed her version of events, she identified Alvarez and pointed toward him in the bedroom. Faltys stated that when he obtained Alvarez's identification, he photographed it and held onto it. Alvarez was "under an investigative detention" at that point. According to Faltys, Alvarez could have walked out the door at that point, notwithstanding that Faltys had his identification.

{¶ 25} Faltys testified that two officers and the NAO were in the room, with Faltys closest to the door, Mauri to his left, and the NAO across from Alvarez. He denied that Alvarez was "surrounded" but stated that the officers were "in front of" Alvarez, who "had

a clear path to leave." Faltys acknowledged that there was only one means of egress from the bedroom, and Alvarez was aware of the allegations against him. Faltys stated that he had been in uniform, wearing a badge, and in possession of his service weapon and handcuffs.

**{¶ 26}** The following exchange occurred during Faltys's cross-examination:

Q. And knowing that Mister Alvarez is the accused in this situation, you all begin questioning him as to what happened?

A. Yes, investigating his side of the story, yes.

Q. Okay an investigation or asking questions that could illicit an incriminating response from Mister Alvarez?

A. It could have.

Q. And again, at this point, you did not give him any sort of Miranda warnings at all?

A. No.

**{¶ 27}** Faltys testified that, once officers had learned that Alvarez was accused of domestic violence, "he wasn't free to go," and Faltys was in possession of Alvarez's identification while he was being questioned.

**{¶ 28}** At the suppression hearing, defense counsel relied on *State v. Westover*, 2014-Ohio-1959 (10th Dist.), in which "a consensual encounter escalated into an investigative detention." *Id.* at ¶ 34. In *Westover*, the Tenth District held that "no reasonable person would have felt free to terminate the encounter and go about their business, where an officer is holding that individual's identification and using it to run a

warrants check." *Id.* at ¶ 26, citing *State v. Jones*, 2010-Ohio-2854 (10th Dist.). According to the Tenth District, "when an officer takes the further action of retaining an individual's identification to run a warrants check, the officer has implicitly commanded the individual to remain on the scene, as no reasonable person would abandon their identification, and has demonstrated that they suspect criminal activity is afoot." *Id.* at ¶ 28.

Municipal Court Decision

{¶ 29} In granting part of Alvarez's motion to suppress, the municipal court found that, when the officers questioned Alvarez after the victim had identified him, they were "not in the fact-finding process," because they had already observed and taken pictures of the victim's injuries and questioned the victim; the victim had described the facts and circumstances leading up to the physical attack and identified Alvarez as her attacker. The court reasoned:

> Both officers testified that after being identified as the assailant, the male [Alvarez] was not free to leave. Although . . . the suspect was not yet handcuffed or informed of a formal arrest, he was being deprived of his freedom [to] leave, he was in custody. Under the factual circumstances known to the officers, *Miranda warnings* should have been given prior to asking him, "what happened in his own words." Both officers testified that the question could have elicited an incriminating response. When a statement, question or remark by a police officer is reasonably likely to elicit an incriminating response from a suspect it is an interrogation. . .

When the officers first entered the bedroom, their attention was focused exclusively on the female. Nothing was asked of any of the men in the room. There was no constructive or actual restraint on the men. The video shows that they were allowed to move and enter freely, without police interruption. The officers did not place any attention to any of the males in the room. However, after the female provided facts and stated that the man sitting on the bed punched her, there was a shift. The male identified by the victim was not free to leave and the officers testified that based on the law and statements of the victim, they would arrest the male. Some of the questions asked of the male were general in nature and not subject to Miranda. However, the question asked, "what happened in his own words", is not a general fact-finding question especially considering all the information already known to the officers. . .

On this basis, the trial court found that Alvarez's answer to the question about what had happened (in his own words) was not admissible at trial. However, other statements made in response to questions about his name, identification, and the like were admissible.

Applicable Law

**{¶ 30}** "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 2003-Ohio-5372, ¶ 8. When ruling on a motion to suppress, "the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.*, citing

*State v. Mills*, 62 Ohio St.3d 357, 366 (1992). "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.*, citing *State v. Fanning*, 1 Ohio St.3d 19, 20 (1982). "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997).

{¶ 31} Until suspects are "in custody," they do not have a right to warnings under *Miranda*, 384 U.S. 436 (1966). *State v. Moody*, 2012-Ohio-3390, ¶ 12 (2d Dist.). "Custodial interrogation is ' "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." ' " *Id.,* citing *State v. Roberts*, 32 Ohio St.3d 225, 226, fn. 1 (1987), quoting *Miranda* at 444. "In order to determine if a person is in custody for purposes of *Miranda*, the court must determine whether there was a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest." *Id.,* citing *State v. Hoffner*, 2004-Ohio-3430, ¶ 27, citing *California v. Beheler*, 463 U.S. 1121 (1983).

{¶ 32} "A seizure equivalent to an arrest exists where there is: (1) an intent to arrest, (2) the seizure is made under real or assumed authority, (3) accompanied by an actual or constructive seizure of the person, and, (4) which is so understood by the person arrested." *Id.* at ¶ 13, citing *State v. Walker*, 2012-Ohio-847, ¶ 22 (2d Dist.); *State v. Pyle,* 2003-Ohio-6664, ¶ 14 (2d Dist.). " 'A seizure is an arrest . . . if a "reasonable person" in the suspect's position would have understood the situation to constitute a restraint on his freedom of movement of the degree the law associated with formal

arrest.' " *Id.* citing *Pyle.* ". . . [I]f the police take actions that would lead a reasonable person in the defendant's position to believe that he was going to be detained indefinitely, the encounter is custodial." *Id.,* citing *State v. Wilkins,* 2004-Ohio-3919, ¶ 20 (2d Dist.).

**{¶ 33}** In *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980), "the Supreme Court pointed out that in order to constitute 'interrogation' the police conduct must reflect a measure of compulsion above and beyond that inherent in custody itself." *State v. Waggoner*, 2006-Ohio-844, ¶ 9 (2d Dist.) *Waggoner* stated*:*

> . . . [T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an

incriminating response.

(Emphasis in original.) *Id.*, citing *Innis* at 301-302.

{¶ 34} This Court has found the following factors to be relevant in determining whether an interrogation was custodial: 1) where the questioning took place – i.e., was the defendant comfortable and in a place a person would normally feel free to leave?; 2) was the defendant a suspect at the time the interview began (bearing in mind that *Miranda* warnings are not required simply because the investigation has focused); 3) was the defendant's freedom to leave restricted in any way; 4) was the defendant handcuffed or told he was under arrest; 5) were threats made during the interrogation; 6) was the defendant physically intimidated during the interrogation; 7) did the police verbally dominate the interrogation; 8) what was the defendant's purpose for being at the place where the questioning took place?; 9) were neutral parties present at any point during the questioning; and 10) did police take any action to overpower, trick, or coerce the defendant into making a statement. *State v. Brock*, 2017-Ohio-759, ¶ 18 (2d Dist.), citing *State v. Estepp,* 1997 WL 736501 (2d Dist. Nov. 26, 1997); *State v. Jones*, 2014-Ohio-1716 (5th Dist.). The subjective intent of the police officer is not relevant in determining whether a defendant was in custody. *State v. Cundiff*, 2011-Ohio-3414, ¶ 57 (2d Dist.).

[A] noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of

the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because . . . the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' "

*Brock* at ¶ 20, quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

Analysis

{¶ 35} The videos offered at the suppression hearing depicted the following. At the beginning of the videos, the young man was outside directing the officers to the victim's location. When they arrived, the officers proceeded up a stairway to a bedroom at the stop of the stairs. A full-sized air mattress was visible to the left, perpendicular to the wall, and the victim was seated by a window. There was also a twin-sized mattress on the right side of the room, closer to the entrance. Alvarez was seated on the twin mattress, although his role was not yet known to the officers, and another man in a blue shirt invited the officers into the room. The officers immediately ascertained that no one present spoke English. There was an open-doored closet across from the victim.

{¶ 36} Officer Mauri began to question the victim using the translation application on her phone. Mauri then stated, "Her husband hurt her." Officer Faltys took photos of the victim's face with his phone. Faltys was requesting a Spanish interpreter on his radio while the victim wrote on a pad that she gave to Mauri. The pad contained Alvarez's full

name. Mauri continued to type into the application on her phone and exchange her phone with the victim. Mauri advised Faltys that the incident began with an argument, and he took notes on a small spiral pad. Faltys appeared to point to his own driver's license to inquire of the victim if she had identification, and she said no. After being handed the phone again from the victim, Mauri stated, "She wanted to leave" because "he" is "abusive."

{¶ 37} The man in the blue shirt re-entered the room with a young man who spoke English. The young man who initially directed the officers inside was sitting on the twin bed next to Alvarez, and a small child was also in the room. The man in the blue shirt sat on the same bed as the victim. The English-speaking young man indicated that he lived nearby but did not know the victim. Mauri asked him to help translate. Faltys then learned that the NAO was on scene, went downstairs to get him, and led the NAO back upstairs. While Faltys was out of the room, the English-speaking young man spoke to the victim, then told Mauri that the victim wanted to leave because she did not feel comfortable there.

{¶ 38} When the NAO entered the room, the English-speaking young man departed, and Mauri asked the NAO to ask the victim what had happened from the beginning of the day. The NAO and the victim spoke, and he translated, "they were arguing," "she wanted to leave," "she insulted him," "he felt insulted," "then he hit her." The NAO related that it had happened at 12:30 p.m. in the bedroom where the victim was seated, and she was hit one time on her lip and cheek. The victim indicated the area on her face where she had been hit. Mauri asked the NAO to ask the victim if she knew

"where he'd go"; after speaking to her, the NAO responded that she did not know where he went. Mauri advised the NAO to ask the victim, "Do you think he's going to come back?" The victim then pointed to Alvarez on the other bed; the NAO turned around, pointed to Alvarez, and stated, "It's him." Mauri questioned the NAO, "It's him?" The NAO asked a question of Alvarez while pointing at the victim, and Alvarez nodded and said, "Yeah." The NAO said, "He was the one . . .," and Mauri asked, "You're the one who hit her?" Alvarez said, "Si."

{¶ 39} At Falty's direction, the NAO asked Alvarez if he had identification, and the officers watched while Alvarez walked to the closet and retrieved it. He handed his identification to Faltys and sat back down on the bed; the officers confirmed that the information on the identification was the same as that relayed by the victim. While the officers discussed the identification, Alvarez got up from the bed and returned with a bottle of water. The child remained on the twin bed, and Faltys took a picture of Alvarez's identification with his phone. Mauri told the NAO, "We thought he left." While the child was interacting with Alvarez, Faltys asked the NAO to ask the victim whether she and Alvarez had a child together. Alvarez appeared to be eating something at this point. The NAO spoke to the victim, then pointed to the child and replied affirmatively.

{¶ 40} At Faltys's instruction, the NAO asked Alvarez for his name and date of birth, which Alvarez provided, along with the name of the child and the child's date of birth. Mauri asked the NAO, "what happened in his words?" After speaking to Alvarez, the NAO related that Alvarez and the victim had had some kind of argument about going to church; as a result, the victim got upset, started picking up her stuff, wanted to leave,

and started insulting Alvarez. Alvarez asked the victim, "What have I done to you to deserve this," felt insulted by the victim, and hit her.

{¶ 41} The video showed Alvarez gesturing with his right hand in a fist. Officer Mauri directed the NAO to advise Alvarez to stand, he did so, and Alvarez placed his hands behind his back. Faltys directed the NAO to advise Alvarez that he "just can't hit her because he feels insulted." While Mauri handcuffed Alvarez, Faltys advised the NAO to tell Avarez and the victim that Alvarez was going to be arrested for hitting her. The NAO confirmed that the victim and Alvarez were married.

{¶ 42} The man in the blue shirt then spoke to Alvarez and the NAO. The NAO stated that he and the man in the blue shirt both told Alvarez that what he had done was illegal. The victim advised the NAO that she wanted to go somewhere else, and she was told that she was free to do so. At Faltys's direction, the NAO told the victim that there was paperwork to be filled out, and Alvarez was escorted out of the home and placed in the officers' cruiser.

{¶ 43} After viewing the interactions on the videos and considering the factors relevant to whether the interrogation was custodial, we conclude that Alvarez was not in custody during his interaction with the officers until he was placed in handcuffs. All the men present were able to move about freely while the victim related what had happened to the officers. Alvarez was not at a police station but in a home, where one would normally feel comfortable to leave. The officers knew the name of the suspect but did not realize that he was in their midst until several minutes had elapsed. When the victim identified Alvarez, his freedom of movement still was not curtailed in any way. The

officers did not draw their weapons, touch or threaten Alvarez, or command that he obey them. It was the NAO, without direction from the officers, who first asked Alvarez if he had hit the victim after the victim pointed to Alvarez.

{¶ 44} Alvarez was permitted to walk to the closet to retrieve his identification. He interacted with the child and ate something while the police gathered information and got a bottle of water. The question posed by Mauri, "what happened in his own words," was not a leading question that prompted or encouraged a specific answer or an incriminating response, and Alvarez was not ordered to respond to it.

{¶ 45} Although Faltys stood close to the door of the room in the videos, his demeanor did not appear intimidating, and he did not block the door. Throughout the interaction, the tone was light and conversational, and there was no suggestion that the officers took any action to overpower, trick, or coerce Alvarez into making his statement. No one raised their voice in addressing Alvarez.

{¶ 46} We find *Westover,* 2014-Ohio-1959, the case cited by defense counsel, to be distinguishable. In that case, what began as a consensual encounter developed into an investigative detention. While on routine patrol, Officer Jackson observed three or four nervous-seeming people, including Westover, standing outside a legally parked vehicle with the trunk open. *Id.* at ¶ 3-4. As Jackson passed by, she observed someone take a box from the trunk into a nearby home; Jackson knew that home to be associated with drug activity. *Id.* at ¶ 4. Jackson turned around, parked behind the vehicle, and radioed for assistance based upon a " 'suspicious group of people.' " *Id.*

{¶ 47} Jackson approached the group and asked what they were doing; she was

told they were waiting for someone to come out of the home into which the item from the trunk had been taken. *Id.* at ¶ 6. When Jackson asked the group what was in the box that had been removed from the trunk, she was advised that it was a toolbox. *Id.* Jackson asked the group for identification, and two more officers arrived in a marked cruiser. Jackson took the identifications to her cruiser and checked for outstanding warrants. *Id.* at ¶ 7. While she did so, the other two officers exited their cruiser and stood next to the group on the sidewalk. *Id.* The Tenth District noted that there was no indication that Jackson had advised the group that she wanted their identifications to run a warrants check. *Id.* Westover was arrested on an outstanding warrant, and heroin was subsequently discovered on his person. *Id.* at ¶ 9.

{¶ 48} In denying Westover's motion to suppress, the trial court found that, because Westover had "voluntarily provided his identification to the officers, the officers then had 'a right to run a record check, and if a record check comes back with a warrant at that point, they have a right to make an arrest.' " *Id.* The trial court concluded that a warrantless seizure had not occurred. *Id.*

{¶ 49} The Tenth District reviewed the three categories of police-citizen encounters: a consensual encounter, which does not require objective justification; a *Terry* stop, which requires reasonable, articulable suspicion of criminal activity; and an arrest, which must be supported by probable cause. The court then determined that when Jackson had retained Westover's identification and taken it to her cruiser to run a warrants check, he had been "unconstitutionally seized." *Id.* at ¶ 14, 21, citing *State v. Jones*, 2010-Ohio-2854, ¶ 24 (10th Dist.).

{¶ 50} In *Jones*, the defendant was observed by two officers on bicycle patrol in a running, legally parked vehicle with the lights off at 1:00 a.m. in a high crime area.  *Id.* at ¶ 3.  Jones, who was "nervous, shaking, and breathing heavily," told the officers that he was waiting to go to work and had pulled over to text his girlfriend."  *Id.* at ¶ 4.  The officers testified that Jones "was not committing any traffic offense, no odor of alcohol or marijuana was about [his] person, the officers had no indication that [he] was involved in narcotics or prostitution activity, and nothing suggested that defendant was otherwise involved in or about to commit any kind of criminal activity."  *Id.*  Based "upon a belief that defendant had failed to provide a good explanation for why he was in the area, coupled with the reputation of the area and defendant's nervousness, the officers, relying on their intuition, suspected that something might be wrong."  *Id.* at ¶ 5.  Jones was asked for his driver's license "to verify his identity and to run a records check for warrants." He provided it while remaining in his vehicle, and one of the officers testified that Jones "was not under arrest at that time and was free to leave had he chosen to do so."  *Id.* Jones subsequently admitted to having a knife, which the police confiscated.  *Id.* at ¶ 6. The trial court granted Jones' motion to suppress the knife.

{¶ 51} After defining a consensual encounter, a *Terry* stop, and an arrest, *Jones* determined that "no reasonable person would believe that he or she is free to terminate the encounter and simply drive away when an officer retains his or her driver's license for the purpose of running a computer check for outstanding warrants."  (Citations omitted). *Id.* at ¶ 25.  According to *Jones,* the police officer implicitly commanded the defendant to remain on the scene by retaining his driver's license to run a check for outstanding

warrants because, as a practical matter, the defendant "was immobilized without his driver's license." *Id.* at ¶ 26. "To abandon his or her driver's license and drive away is not a realistic option for a reasonable person in today's society." *Id.*

{¶ 52} *Jones* held:

. . . [E]ven if the police officers' interaction with defendant began as a consensual encounter, the consensual nature of that encounter escalated into an investigative detention when the officers, unsatisfied with defendant's explanation as to why he was parked in a high-crime area, sought to confirm their intuition that something might be wrong. The officers asked for and retained defendant's driver's license to run a warrants check to confirm or dispel their suspicions. At that moment, any consensual aspects of the encounter ended, and defendant was seized within the meaning of the Fourth Amendment.

{¶ 53} Unlike the encounters in *Westover* and *Jones*, Alvarez was in a home with family members and others he knew, moving freely about, eating, drinking, and interacting with his child. Officer Faltys testified that Alvarez was free to leave after his identification was obtained. The officers also did not request backup by additional officers beyond interpretation services. Significantly, although Faltys retained Alvarez's identification, he did not leave Alvarez's presence with it, suggest that a records check would occur, or suggest that it was obtained for any purpose beyond confirming Alvarez's identity. Faltys did not block the egress from the bedroom. Unlike in *Westover* and *Jones,* Alvarez's demeanor was calm and undisturbed throughout the encounter. We reject any

suggestion that possession of identification by law enforcement, in itself, equates to custody, because the custody analysis involves the perception of a reasonable person in the suspect's position *in consideration of all the surrounding circumstances*, not just one. In other words, obtaining and holding Alvarez's identification alone could not be dispositive of the issue of whether he was in custody, and the encounter as a whole did not reflect a measure of constraint characteristic of custody. As such, *Miranda* warnings were not required.

**{¶ 54}** Based upon the foregoing, the State's assignment of error is sustained. The judgment of the trial court is reversed, and the matter is remanded for further proceedings.

. . . . . . . . . . . .

EPLEY, P.J. and WELBAUM, J., concur.